905 P.2d 29

Lawrence CIERI, Jr. and Janis Cieri, Plaintiffs–Appellees/Cross–Appellants,[1]

v.

LETICIA QUERY REALTY, INC., and Leticia Query, Defendants–Appellants/Cross–Appellees, and Joseph Y. Yamaji and Violet N. Yamaji, Defendants–Appellees.

No. 17445.

Supreme Court of Hawai'i.

Sept. 28, 1995.

As Amended Oct. 12, 1995.

1. The Cieris' cross-appeal was dismissed by stipulation approved by this court on April 17, 1994.

Edward C. Kemper of Kemper & Watts, on the briefs, Honolulu, for defendants-appellants/cross-appellees Leticia Query Realty, Inc. and Leticia Query.

Joseph A. Kinoshita of Kinoshita & Steele, on the briefs, Honolulu, for plaintiffs-appellees/cross-appellants Lawrence Cieri, Jr. and Janis Cieri.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

This is a case involving real estate fraud and statutory unfair practices. Plaintiffs-appellees Lawrence Cieri, Jr. and Janis Cieri (collectively, the Cieris) purchased a residence from defendants-appellees Joseph and Violet Yamaji (collectively, the Yamajis). In the transaction, defendants-appellants Leticia Query and Leticia Query Realty, Inc. (collectively, the Query entities) served as the Yamajis' licensed real estate broker. Immediately after moving into the residence, the Cieris discovered undisclosed plumbing problems, and they subsequently filed suit against the Yamajis and the Query entities for tortious breach of contract, fraud/misrepresentation, and unfair or deceptive trade acts or practices in violation of Hawai'i Revised Statutes (HRS) chapter 480. By special verdict, a jury found Query individually liable for fraud and for violating HRS § 480–2; the jury exonerated the Yamajis and Leticia Query Realty of any wrongdoing.

Pursuant to the jury's special verdict, the trial court entered judgment against Query for $10,878.00 in treble damages, $12,252.00 in attorneys' fees, and $851.36 in costs. Query appeals the amount of the judgment and the court's denial of her motion for judgment notwithstanding the verdict (JNOV). For the following reasons, we affirm.

## I. BACKGROUND

### A. Facts

On September 21, 1989, the Cieris and the Yamajis signed a Deposit Receipt, Offer and Acceptance (DROA) form for the sale of the Yamajis' twenty-year-old residence to the Cieris. The Yamajis did not live in the resi-

dence and had been renting the property to others for some time. The Query entities had served as the property manager for the property, screening potential renters, collecting rents, making mortgage payments, and reporting problems to the Yamajis. They also ordered and made payments for necessary repairs to the property as directed by the Yamajis.

Mr. Yamaji testified at trial that the property had always been used for rental, and, for the last three years prior to its sale, the residence was rented by the Milliners. Mr. Milliner testified at trial that there were drainage problems with a toilet in one of the bathrooms, that the washing machine would back up and flood the garage, and, when it rained heavily, water often leaked into the family room. Mr. Milliner also testified that, due to problems with the washing machine, flooding occurred approximately once a month during the last two years of his residency. Query was contacted on each occasion, and, according to Mr. Milliner, "responded quickly" by calling plumbers. Query and Mr. Milliner also advised the Yamajis about the problems on several occasions.

Receipts, admitted into evidence at trial, indicated that plumbers had visited the residence on October 15, 1988, December 30, 1988, and April 17, 1989. Problems were found with the laundry washer line, the main bathroom toilet, and a bathtub drain.

In June 1989, because the rental income was becoming insufficient to cover the mounting insurance and mortgage costs, the Yamajis decided to sell the property. Query recommended that, before selling the property, certain repairs be made to the house by the Yamajis, including repairs to the plumbing system. Mr. Yamaji testified that, among other repairs that he had done himself, including raising the family room floor and installing a new shake roof, he had hired a plumber to repair the washer hose.

On September 17, 1989, the Yamajis entered into an exclusive-right-to-sell listing agreement with Leticia Query Realty to sell the residence. The Yamajis, with the assistance of Query, filled out a "Sellers Real Property Disclosure Statement" (the disclo-

sure statement), dated September 29, 1989, in conjunction with the DROA. Question 3–d of the disclosure statement asked: "Have there been any problems with the plumbing (including solar systems, septic tank, or other), electrical, water and/or gas?" Question 1–c asked: "Have you ever had any leaks repaired?" The answers to both questions were "no." The Cieris and Yamajis both signed the disclosure statement. At trial, Mr. Yamaji and Query explained that they had answered the questions in the negative in part because they considered the water in the family room to be "seepage" and the washer and bathtub incidents to be "maintenance" rather than "problems."

Although the sale was to close on December 1, 1989, the Yamajis agreed to let the Cieris move in three days early, subject to prorated rent and an early occupancy agreement. On November 30, 1989, a backup in a second floor bathroom flooded the house and seeped downstairs, damaging the carpet. The Cieris notified Mr. Yamaji, who notified Query, who in turn called a plumber.

Two days later, on December 2, 1989, after Mrs. Cieri used the washing machine, water apparently backed up from the sewage line and flooded the garage. Mr. Cieri testified that human waste was in the water and that the house smelled badly. According to Query, there was some question whether the December 2, 1989 problem was caused by a preexisting condition, or by damage made by the plumber two days earlier on November 30, 1989. The plumbing eventually was fixed, but the Cieris had to relocate for three days and thereby incurred various expenses.

### B. *Prior Proceedings*

On November 23, 1990, the Cieris filed suit against the Yamajis and the Query entities for: (1) tortious breach of contract; (2) fraud/misrepresentation; and (3) unfair and deceptive trade practices under HRS chapter 480. At trial in February 1993, although the jury found that the Yamajis and Query had made false representations to the Cieris, the jury determined that: (1) only Query "[made] the false representation with the

intent to defraud"; [2] (2) the Cieris relied on Query's misrepresentations; [3] and (3) the fraud/misrepresentation on the part of Query was a legal cause of the Cieris' damages. [4] The jury also found that Query, but not Leticia Query Realty, had committed "a deceptive act or practice." [5]

In answer to question No. 11 on the special verdict form, which asked the jury to determine "the amount of [the Cieris'] damages as a result of the breach of contract, [6] fraud, and/or deceptive acts or practices," the jury awarded the sum of $3,626.00. [7] The jury also awarded $7,950.00 for punitive damages.

Pursuant to the jury's special verdict, the trial court, on April 6, 1993, initially entered a judgment in the amount of $10,878.00 ($3,626.00 trebled) pursuant to HRS § 480–13(b)(1) (Supp.1992). [8] The Cieris and Query subsequently filed cross-motions to alter the judgment, or for a JNOV, or for a new trial, arguing that under the Intermediate Court of Appeals' (ICA) decision in *Eastern Star v. Union Building Materials*, 6 Haw.App. 125, 712 P.2d 1148 (1985), the court must award the highest damages chosen by the jury as between fraud and the HRS § 480–2 claim. [9] In *Eastern Star*, the ICA held that, where an award is made under HRS § 480–13 and punitive damages are also awarded for common law counts, "the recovery should be either treble damages *or* punitive damages, whichever is the greater amount." 6 Haw. App. at 142, 712 P.2d at 1160 (emphasis in original).

---

2. Question No. 5 on the special verdict form and the jury's response stated:

> *Question No. 5.* As to any Defendant for whom you have answered "Yes" to Question No. 4, did such Defendant(s) make the false representation with the intent to defraud the Plaintiffs? . . . .

| | YES | NO |
|---|---|---|
| Joseph and Violet Yamaji | | X |
| Leticia Query | X | |
| Leticia Query Realty | | X |

3. Question No. 6 on the special verdict form and the jury's response stated:

> *Question No. 6.* As to any Defendant for whom you have answered "Yes" to Question No. 5, did the Plaintiffs rely on the representation(s) of such Defendant(s)? . . . .

| | YES | NO |
|---|---|---|
| Joseph and Violet Yamaji | | X |
| Leticia Query | X | |
| Leticia Query Realty | | X |

4. Question No. 8 on the special verdict form and the jury's response stated:

> *Question No. 8.* As to any Defendant for whom you have answered "Yes" to Question No. 7, was the misrepresentation/fraud of such Defendant(s) a legal cause of Plaintiffs' damages? . . . .

| | YES | NO |
|---|---|---|
| Joseph and Violet Yamaji | | X |
| Leticia Query | X | |
| Leticia Query Realty | | X |

5. Question No. 9 on the special verdict form and the jury's response stated:

> *Question No. 9.* Did either Leticia Query or Leticia Query Realty commit a deceptive act or practice? . . . .

| | YES | NO |
|---|---|---|
| Leticia Query | X | |
| Leticia Query Realty | | X |

6. In answer to question No. 1 on the special verdict form, the jury found that the Yamajis did not breach their contract with the Cieris.

7. Based on the questions regarding misrepresentation that preceded question No. 11, the award for "fraud" includes "misrepresentation." Hereinafter, as used in this opinion, the phrase "award of $3,626.00 for fraud" means the jury's award of $3,626.00 for fraud/misrepresentation and unfair or deceptive acts or practices.

8. HRS § 480–13(b) provides:

> (b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480–2:
> (1) May sue for damages sustained by the consumer, and if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys fees together with the costs of suit; and
> (2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys fees together with the cost of suit.

9. Although the Cieris and Query both relied on the principle announced in *Eastern Star*, they disagreed as to its application. The Cieris contended that, under HRS § 480–13, an award of attorneys' fees is mandatory and, therefore, must be included in the calculus of the "greater amount" of recovery dictated by *Eastern Star*; Query disagreed and argued that an award of attorneys' fees is not considered when determining the "greater amount" of recovery. *See infra* section II.B.

On May 7, 1993, the trial court held a hearing on the cross-motions. At the hearing, counsel for the Cieris—confronted with *Eastern Star*—opted for the award for fraud and punitive damages, totaling $11,576.00 ($3,626.00 plus $7,950.00). The court therefore ruled that judgment be entered in that amount.

Thereafter, counsel for the Cieris attempted to recover attorneys' fees on the fraud claim, and the parties filed supplemental memoranda. On September 28, 1993, the court reversed its prior position and entered a new judgment in the amount of $10,878.00 in treble damages, $12,252.00 in statutory attorneys' fees, and $851.36 in costs. Query timely appeals from this judgment.

## II. *DISCUSSION*

### A. *Statutory Unfair or Deceptive Acts or Practices*

Query first argues that the trial court erred in basing the amount of the judgment on the Cieris' claim under HRS chapter 480, because the Cieris do not qualify as "consumers" under HRS § 480–1 and therefore do not have standing to sue for unfair or deceptive acts or practices. Preliminarily, however, we take this opportunity to discuss the scope of the applicability of HRS § 480–2, which proscribes "unfair or deceptive acts or practices *in the conduct of any trade or commerce*" (emphasis added), as it pertains to the transaction and the defendants at issue in this case.

An interpretation of a statute is a question of law reviewed *de novo. Mehau v. Reed,* 76 Hawai'i 101, 112, 869 P.2d 1320, 1331 (1994).

### 1. The "Trade or Commerce" Requirement of HRS § 480–2

#### a. *Federal Beginnings*

The genesis of Hawai'i's consumer protection statute is in federal antitrust law. Although the federal arsenal of antitrust laws is comprised of several differently worded statutes of varying scope that have generated volumes of case law, all of the acts have a common focus on trade, commerce, and business, and all share a concern for the preservation of unrestrained economic competition and free trade. *See, e.g.,* Sherman Act, 15 U.S.C. § 1 (1973) ("Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* . . . is declared to be illegal." (Emphasis added.)); Clayton Act, 15 U.S.C. § 13 (1973) ("It shall be unlawful for any person engaged in *commerce,* in the course of such *commerce,* either directly or indirectly, to discriminate in price between different purchasers of *commodities* of like grade and quality, where either or any of the purchases involved in such discrimination are in *commerce* . . . and where the effect of such discrimination may be substantially to lessen *competition* or tend to create a monopoly in any line of *commerce,* or to injure, destroy, or prevent *competition* with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." (Emphases added.)); *Standard Oil Co. v. FTC,* 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951) (In passing the antitrust laws, "Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent."); 1 E. Kintner, *Federal Antitrust Law,* § 1.1, 1 (1980) ("The antitrust laws of the United States are rooted in a commitment to the promotion of free enterprise and the existence of competition in the marketplace."). This underlying concern with trade, commerce, or business is perhaps best expressed by an early pronouncement of the United States Supreme Court, analyzing the Sherman Act, 15 U.S.C. § 1, *et seq.,* wherein the Court stated:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment [conducive] to the preservation of our democratic political and social institutions. But even were that premise open to ques-

tion, the policy unequivocally laid down by the Act is competition. And to this end it prohibits "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States."

*Northern Pac. R.R. Co. v. United States*, 356 U.S. 1, 4–5, 78 S.Ct. 514, 517–518, 2 L.Ed.2d 545 (1958).[10]

Hawai'i's antitrust and consumer protection law is an amalgam of the various prohibitions contained in the federal law; however, our consumer protection provisions bear the most resemblance to the 1938 amendments to Section 5 of the Federal Trade Commission Act (FTCA). Originally, the 1914 version of the FTCA limited the power of the Federal Trade Commission (FTC) to prevent "unfair methods of competition." Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 719. In 1938, however, Congress amended section 5 of the FTCA to give the FTC express authority over "unfair or deceptive acts or practices." Act of March 21, 1938, ch. 49, § 3, 53 Stat. 111, amending Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 719, codified at 15 U.S.C. § 45(a)(1) (1982). The 1938 amendment "created direct protection of consumer interests on a par with market competitors, heralded increased activity of the FTC in all aspects of commercial advertising with an interstate effect, and spurred parallel efforts by the states." VII E. Kintner, *Federal Antitrust Law*, § 49.1, 124 (1988).

### b. The "Trade or Commerce" Requirement in the Development of Hawai'i's Consumer Protection Law

Embodied in Hawai'i's virtually word-for-word adoption of the prohibitions contained in the Sherman, Clayton, and FTC acts is the federal antitrust laws' focus on commerce, the economy, and competition. In 1965, in an effort to "provide the Attorney General with much needed authority to bring proceedings to enjoin unfair and deceptive business practices by which consumers are defrauded and the economy of the State is harmed," Hse.Stand.Comm.Rep. No. 55, in 1965 House Journal, at 538, the state legislature passed a provision, then codified as Revised Laws of Hawai'i (RLH) § 205A–1.1 (1965) and recodified today as HRS § 480–2 (Supp.1992).[11] RLH § 205A–1.1 was, and HRS § 480–2 is, virtually identical to section 5 of the FTCA and provided, very simply, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RLH § 205A–1.1; *see also Island Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 300, 627 P.2d 260, 268 (1981) (HRS § 480–2 is "a virtual counterpart of § 5(a)(1) of the [FTCA].").

From the outset, it was clear that the focus of what would eventually be the spearhead of

**10.** An undercurrent in federal antitrust law, as hinted at by the above-quoted language from *Northern Pacific*, is, in the event of a conflict between the goal of preserving competition and the "populist" goals of "the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment [conducive] to the preservation of our democratic political and social institutions," *Northern Pacific*, 356 U.S. at 4, 78 S.Ct. at 517, that the "populist" goals must yield. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) ("Taken as a whole, the legislative history [of the Clayton Act, § 7] illuminates congressional concern with the protection of *competition*, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition."); 1 P. Areeda & D. Turner, *Antitrust Law*, ¶ 103, 7 (1978) ("[T]here is little if anything in the cases that suggests the courts have in fact been willing to pursue populist goals at the expense of competition and efficiency....

If anything, they support the priority of competition and its efficiency goals.").

**11.** HRS § 480–2 provides in pertinent part:

> **§ 480–2 Unfair competition, practices, declared unlawful.** (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
>
> (b) In construing this section, the courts ... shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
>
> ....
>
> (d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

Hawai'i's consumer protection law was on trade, commerce, and business:

> Your committee recognizes, as did the Congress of the United States in 1914 when it enacted the Federal Trade Commission Act, that it is impractical to enact a law prohibiting each unfair method of competition or unfair or deceptive act or practice *in the conduct of trade and commerce* after the need therefor comes to light. In explaining the need for the broad language of the Federal Trade Commission Act, Congress said:

> > It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit *business* of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances.

> The hundreds of unfair *business* practices which have been effectively stopped under the authority of the Federal law attest of Congress' wisdom in doing more than merely enumerating and prohibiting the then known unfair *business* practices. A law similar in effect to the Federal law was enacted by the State of Washington in 1961. Your committee is informed that the Washington law, like the Federal law, has been most effective in dealing with unfair and deceptive *business* practices.

Hse.Stand.Comm.Rep. No. 55, in 1965 Hse.Journal, at 538 (emphases added); *see also* Hse.Stand.Comm.Rep. No. 267, in 1965 Hse.Journal, at 603 ("Your Committee concludes that a law similar in effect to the federal law dealing with unfair and deceptive business practices is essential to a State-sponsored fair business program in Hawaii.").

The focus on trade, commerce, and business is also reflected in HRS § 480–13, which sets out the cause of action for violations of HRS § 480–2. Prior to its amendment in 1987, HRS § 480–13 stated in pertinent part:

**§ 480–13 Suits by persons injured; amount of recovery, injunctions.** (a) Any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:

(1) May sue for damages sustained by the person, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys fees together with the cost of suit; *provided that no showing that the proceeding or suit would be in the public interest (as those terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary when the party against whom the proceeding or suit is brought is a merchant as that term is defined in chapter 490* [.]

HRS § 480–13 (1985) (emphasis added) [hereinafter, the language underscored above is referred to as the public interest/merchant requirement]. Thus, in order to have had standing to bring an action under the 1985 version of HRS § 480–13, a plaintiff was required to demonstrate either that the suit was in the "public interest" or that the defendant was a "merchant." This requirement was linked to the focus of the statutory scheme on competition. As the ICA noted in *Beerman v. Toro Manufacturing Corp.*, 1 Haw.App. 111, 118, 615 P.2d 749, 754 (1980), "[t]he legislative history to §§ 480–2 and 480–13 makes clear that the paramount purpose of both statutes is to prevent deceptive practices *by businesses* that are injurious to other businesses and consumers." (Emphasis added.)

In 1987, the state legislature passed Act 274, 1987 Haw.Sess.L., Act 274, §§ 1–5 at 834–40 (Act 274), in part to ease the burden on the state attorney general's limited resources. Act 274, *inter alia,* marshalled the assistance of the general public in combating the perpetration of unfair and deceptive acts

in trade and commerce and allowed members of the consuming public to act as "private attorneys general" to enforce HRS §§ 480–2 through 480–13. *See* Sen.Stand.Comm.Rep. No. 1056, in 1987 Senate Journal, at 1345 ("Your Committee also believes that private enforcement of antitrust laws is beneficial to the judicial process as it discourages violations and eases the burden on the attorney general's limited resources.").

To this end, Act 274 created a new HRS § 480–2(d), which provides that "[n]o person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful under this section." By so doing, the legislature principally sought to preclude HRS § 480–2's applicability to "private disputes between business[persons]." *See* Sen. Stand.Comm.Rep. No. 1056, in 1987 Senate Journal, at 1345 ("[Y]our Committee has amended the bill as follows: ... Provided that suits based upon unfair or deceptive acts or practices under section 480–2 may be brought only by consumers, the attorney general, or the office of consumer protection, in effect precluding its application to private disputes between business [persons].").

HRS § 480–1 (Supp.1992) defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."

Act 274 also eliminated the public interest/merchant requirement in HRS § 480–13 and added a new section, HRS § 480–13(b) specifically concerning recovery under HRS § 480–2. *See* Sen.Conf.Comm.Rep. No. 105, in 1987 Senate Journal, at 872 ("your Committee has made numerous amendments which include the following: ... Amended section 480–2 ... by providing that it shall not be necessary to show that the proceeding or suit brought under this section would be in the public interest[.]"). Indeed, HRS § 480–2(c) (Supp.1992) now provides that "[n]o showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of

the Federal Trade Commission Act) is necessary in any action brought under this section."

The 1987 amendments to HRS chapter 480, therefore, had significant ramifications for the individual consumer in Hawai'i. In addition to aiding in the enforcement of HRS chapter 480 to benefit and preserve economic competition, the principal personal effect of the 1987 amendments to HRS chapter 480 on the individual was to allow "consumers," who had been the victims of unfair or deceptive acts or practices in the conduct of any trade or commerce, a means to seek recompense for purely individual wrongs; the principal social effect of the amendments was to reinforce the consumer protection aspects of HRS chapter 480.

2. **Relative to the Query Entities, the Transaction at Issue in the Present Case Involved Conduct in "Any Trade or Commerce."**

Despite the significant changes to the statute, the emphases of the 1987 amendments did not inject a new purpose into HRS chapter 480 and, most importantly, did not detract nor retreat from any of the purposes associated with trade, commerce, and business previously discussed above. HRS § 480–2's prohibition of "unfair or deceptive acts or practices *in the conduct of any trade or commerce*" and HRS chapter 480's concomitant focus on trade, commerce, and business remained and continues to frame the applicability of the statutory scheme in general.

However, as previously stated, Query argues on appeal that the Cieris do not have standing as "consumers," pursuant to HRS § 480–1, to sustain an action for unfair or deceptive acts or practices. As a threshold issue, however, we must first address whether the defendants in this case engaged in "conduct in any trade or commerce" with respect to the transaction at issue.

Heretofore we have not had occasion to address the independent significance of the terms "trade or commerce" in HRS § 480–2. However, insofar as many, if not most, of the several states' consumer protection statutes,

including Hawaiʻi's, have a common genesis in the federal antitrust statutes, we look to other jurisdictions for guidance.

In *Lantner v. Carson*, 374 Mass. 606, 373 N.E.2d 973 (1978), the Supreme Judicial Court of Massachusetts held that Section 2 of Massachusetts' consumer protection statute, General Laws of the Commonwealth of Massachusetts chapter 93A (chapter 93A), which is identical to HRS § 480–2, "is not available where the transaction is strictly private in · nature, and is in no way undertaken in the ordinary course of a trade or business." *Id.* at 608, 373 N.E.2d at 975. In *Lantner*, the plaintiffs had purchased a private residence from the defendants-sellers.[12] Shortly after the plaintiffs' occupancy of the residence, several problems arose, including problems related to a defective water system and chimney. Plaintiffs repaired the defects and brought suit against the defendants-sellers for, *inter alia*, the cost of the repairs.

Noting that section 2 of Massachusetts' consumer protection statute proscribed "unfair or deceptive acts or practices in the conduct of any trade or business," the Massachusetts court rejected plaintiffs' argument that Massachusetts' consumer protection statute is "broad enough to reach *any* type of commercial exchange, regardless of the nature of the transaction or the character of the parties involved," and that "the remedial provisions of the statute should be available to the consumer who purchases from an individual homeowner, regardless of the fact the transaction is not in pursuit of the seller's ordinary course of business." The court held that "the proscription in section 2 [of the consumer protection act] of 'unfair or deceptive acts or practices in the conduct of any trade or commerce' must be read to apply to those acts or practices which are perpetrated in a *business context*." *Id.* at 611, 373 N.E.2d at 977 (emphasis added).

In so holding, the *Lantner* court reasoned that:

An individual homeowner who decides to sell his [or her] residence stands in no better bargaining position than the individ-

ual consumer. Both parties have rights and liabilities established under common law principles of contract, tort, and property law. Thus, arming the "consumer" [with chapter 93A] in this circumstance does not serve to equalize the positions of buyer and seller. Rather, it serves to give superior rights to only one of the parties, even though as nonprofessionals both stand on an equal footing.

*Id.* at 612, 373 N.E.2d at 977. The *Lantner* court, however, did not further elucidate on what would constitute a "business context."

Subsequently, in *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167 (1980), the plaintiffs-borrowers brought an action seeking a declaration that a promissory note executed by them in favor of defendant-lender and his wife was void due to a violation of the Massachusetts usury statute. The plaintiffs-borrowers also contended that the violation of the statute was an unfair and deceptive act that in turn constituted a violation of chapter 93A. As in *Lantner*, the Massachusetts high court determined that chapter 93A did not apply to the lender-defendant because the transaction did not occur in a "business context." The court explained that the question whether a transaction took place in a "business context" was an issue of fact that required assessment of factors such as: (1) the nature of the transaction; (2) the character of the parties involved; (3) the activities engaged in by the parties; (4) whether similar transactions had been undertaken in the past; (5) whether the transaction was motivated by business or for personal reasons (as in the sale of a home); and (6) whether the participant played an active part in the transaction. *Id.* at 190–91, 409 N.E.2d at 176.

The *Begelfer* court further specifically noted that chapter 93A did not require that "a commercial transaction must take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability under [chapter 93A]." *Id.* at 191, 409 N.E.2d at 176. Nevertheless, the court reasoned that the transaction did not occur in a "business context" because: (1)

---

12. The plaintiffs in *Lantner* had employed a real estate broker who was not named as a defendant in the case.

the defendants' participation in the real estate transaction underlying the loan was minimal; (2) the defendants had no voice in negotiating the terms of the loan; (3) the payments on the loan were made to an agent and not directly to the defendants; (4) the defendants were solicited by other investors to participate in the loan; and (5) the defendants were not active in the management of the loan.[13]

Later, in *Lynn v. Nashawaty*, 12 Mass. App.Ct. 310, 423 N.E.2d 1052 (1981), the Massachusetts Appeals Court further explained the nature of the "business context" requirement. In *Lynn*, the plaintiffs had purchased a stationery store from the defendants. The defendants had represented to the plaintiffs that there would be $13,000.00 worth of inventory on the store premises at the time of the consummation of the sale. However, the plaintiffs alleged that the inventory was overvalued and brought an action under Chapter 93A for unfair or deceptive acts or practices.

On appeal, the defendants argued that, based upon *Lantner*, Chapter 93A did not apply to "isolated transactions." The Appeals Court rejected the defendants' argument and distinguished *Lantner*, holding that "[t]he sale of a business or business assets by a business[person] is not the same as the sale of a home by an individual homeowner." *Id.* at 313–14, 423 N.E.2d at 1054.

Massachusetts law is therefore uniform in excepting individual sellers of residential real estate from the Massachusetts consumer protection act when such sales do not fall within a "business context," as dictated by the "conduct in trade or commerce" language in Massachusetts General Laws chapter 93A, § 2. The exception, however, has not been similarly applied in situations involving real estate *brokers* and *salespersons* dealing in sales of residential real estate. For example, in *Mongeau v. Boutelle*, 10 Mass.App.Ct. 246, 407 N.E.2d 352 (1980), the defendant-real estate broker, prior to execution of a purchase and sale agreement by the plaintiff-purchaser of a certain parcel of land, misin-

formed the plaintiff as to the acreage of the parcel and failed to disclose that the property was encumbered by a right of way, facts that the broker either knew or should have known. Subsequent to the plaintiff-purchaser's discovery of the defects, he refused to proceed with the purchase and forfeited his deposit. Thereafter, the plaintiff-purchaser brought suit against the defendant-broker, alleging claims based on common law fraud and violation of chapter 93A. As a real estate broker involved in the transaction, the defendant-broker did not dispute the applicability of chapter 93A to him, but asserted that a prior action brought by the plaintiff-purchaser for common law fraud against the individual sellers, stemming from the same transaction, barred the action against him. The trial court dismissed the action. On appeal, the Massachusetts Appeals Court held that the allegations against the defendant-broker were sufficient to state a claim under chapter 93A and remanded the action to the trial court for factual findings on the common law fraud claim.

Similarly, in *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674 (1983), the plaintiffs-buyers purchased a house lot from the defendants-sellers. The defendants-sellers engaged the defendant-broker to market the lot. In their complaint, the plaintiffs-buyers alleged, *inter alia*, that the defendants-sellers and the defendant-broker had represented to them that the land was suitable for a house and that it had passed percolation and high water tests. After the purchase, the presence of a high water table forced the plaintiffs-buyers to truck considerable amounts of fill and soil to the lot to raise its level so that the septic sewer system would meet the requirements of the applicable sanitary code. The counts of the complaint, based on chapter 93A, were tried before a judge without a jury, who ruled in favor of all of the defendants. On appeal, the Supreme Judicial Court of Massachusetts affirmed, holding that: (1) the defendants-sellers were not subject to liability under chapter 93A because they were not engaged in trade or business; and (2) al-

---

**13.** The *Begelfer* court further specifically rejected the argument that, because the defendants actively pursued their legal remedies, the defen-

dants were necessarily "persons engaged in the conduct of any trade or commerce." *Id.*

though the chapter 93A cause of action was properly brought against the broker, the plaintiffs-buyers failed to adduce sufficient evidence at trial to prove the causation element of the claim.

■ As did the courts in *Lantner, Begelfer, Lynn, Mongeau,* and *Nei*, we similarly interpret HRS § 480–2 to require that, in order to fall within the purview of HRS chapter 480, a claim for alleged unfair and deceptive acts or practices against an owner-seller must stem from a transaction involving "conduct in any trade or commerce," similar to the Massachusetts courts' definition of the concept of "business context." The question whether a transaction occurs within a "business context," thus implicating the applicability of HRS chapter 480 to an individual owner-seller, must be determined on a case-by-case basis by an analysis of the transaction.

■ In view of the general scarcity of real estate in Hawai'i, and its concomitant high costs, *see, e.g., Housing Fin. and Dev. Corp. v. Castle,* 79 Hawai'i 64, 80, 898 P.2d 576, 592 (1995), many purchasers of residential real estate utilize and rely on brokers for their expertise and resources, including access to data in locating properties as well as determining pricing of "comparables" as a basis for negotiations. Thus, a party who engages a broker or salesperson to represent him or her in a real estate transaction has a considerable advantage over a party who is not so represented. Accordingly, in the context of the Query entities, in particular, and real estate brokers and salespersons, in general, we believe that real estate brokers and salespersons, unlike individual sellers, are *generally* subject to liability under HRS chapter 480.

As implicitly recognized by the Massachusetts courts, the broker's or salesperson's role in facilitating every real estate transaction in which he or she participates necessarily involves "conduct in any trade or commerce," namely, the systematic sale or brokering of interests in real property. Thus, it is unnecessary to engage in a case-by-case analysis in determining whether a real estate transaction, purportedly involving unfair or deceptive acts or practices by a broker or salesperson who represents a party to such

transaction, occurs in a "business context." Consequently, we hold as a matter of law that a broker or salesperson actively involved in a real estate transaction invariably engages in "conduct in any trade or commerce." Accordingly, the Query entities were properly subject to liability pursuant to HRS chapter 480.

### 3. Standing to Sue as "Consumers" Under Chapter 480

#### a. *Real Estate or Residences Do Not Constitute "Goods" Under HRS § 480–1*

■ Relying on *Kona Hawaiian Associates v. The Pacific Group,* 680 F.Supp. 1438 (D.Haw.1988), Query asserts that the Cieris do not have standing to bring an action under HRS chapter 480 because they do not qualify as "consumers" under HRS § 480–1. As previously noted, HRS § 480–1 defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Query submits that, because real estate or residences do not qualify as "goods," the Cieris are not "consumers."

In *Kona Hawaiian,* the seller of a hotel brought a multi-count suit against a prospective purchaser and the purchaser's partners, asserting, *inter alia,* a claim for unfair and deceptive trade practices based on a violation of HRS § 480–2. The United States District Court for the District of Hawai'i granted summary judgment in favor of the defendants-purchasers, holding that the plaintiff-seller had failed to state a claim under HRS § 480–13 because the defendants-purchasers were not "merchants" under HRS § 480–13. The *Kona Hawaiian* court reasoned that the defendants-purchasers were not "merchants" because "a real estate transaction involving the sale of a hotel, is not a transaction involving goods or services. Accordingly, in this transaction ... the [purchaser's partners] are not merchants within the meaning of [chapter 480]." *Id.* at 1453.

Query asserts that, because the present case similarly arises from a real estate transaction involving the sale of a residence, the trial court should have granted her motion for JNOV on the HRS § 480-2 claim. The Cieris argue that *Kona Hawaiian* is distinguishable for two reasons: first, the real estate transaction at issue in *Kona Hawaiian* dealt with a transaction between the seller and purchaser directly, not between the purchaser and a real estate broker; and second, *Kona Hawaiian*'s ultimate holding concerned whether the seller of the property was a "merchant" under HRS § 480-13 prior to 1987. We disagree with the Cieris.

Pursuant to *Kona Hawaiian*, we hold that real estate or residences do not qualify as "goods" under HRS § 480-1, and the Cieris therefore do not have standing as "consumers" to bring a claim alleging a violation of HRS chapter 480 for the real estate transaction at issue in the present case as purchasers of "goods."

In reaching its conclusion that real estate or residences do not qualify as "goods," the *Kona Hawaiian* court relied on *Lacey v. Edgewood Home Builders, Inc.*, 446 A.2d 1017 (R.I.1982), and *Wendling v. Cundall,* 568 P.2d 888 (Wyo.1977), both of which dealt with the question whether a real estate transaction would qualify as a transaction in "goods." In those cases, the Supreme Courts of Rhode Island and Wyoming relied upon the definition of "goods" located in each state's version of section 2-105 of the Uniform Commercial Code (UCC).[14] Both Rhode Island and Wyoming's versions of section 2-105 are identical to Hawai'i's version, codified in HRS chapter 490, which provides that:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as de-

scribed in the section on goods to be severed from realty.

HRS § 490:2-105(1) (1985). Like Rhode Island and Wyoming's versions of section 2-105, the reference to real estate or residences are conspicuously absent from Hawai'i's version of section 2-105.

We therefore agree with the analysis in *Kona Hawaiian* and hold that, for purposes of determining whether a plaintiff has standing to sue for unfair and deceptive trade acts or practices as a "consumer" pursuant to HRS § 480-13, real estate and residences are not "goods" as that term is utilized in HRS § 480-1.

b. *The Cieris Do Not Have Standing as "Consumers" by Allegedly Having Been "Solicited to Purchase" Brokerage Services By Query.*

██ Alternatively, the Cieris maintain that they have standing as "consumers" under HRS § 480-1 because they allegedly were "solicited to purchase" brokerage services by Query. The infirmity in the Cieris' position, however, is threefold: First, the Cieris did not plead any claims for relief against Query on such grounds, nor did they allege any facts in support of such grounds in their complaint. It is well settled that "the crucial inquiry [with regard to standing] ... is whether the plaintiff has *alleged* such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of ... [the court's] jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf." *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989) (citations, quotation marks and original emphasis omitted, emphasis added).

██ Second, an essential element of the standing inquiry is, *inter alia,* that the party or parties seeking standing "suffered an actual or threatened injury *as a result of* the defendant's wrongful conduct," and that "the injury is *fairly traceable* to the defendant's actions[.]" *Pele Defense Fund v. Paty,* 73

---

**14.** *See* Rhode Island General Laws 1956 (1969 Reenactment) § 6A-2-105; Wyoming Statutes § 34-2-105.

Haw. 578, 593, 837 P.2d 1247, 1258 (1992) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); *see also Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 70, 881 P.2d 1210, 1216 (1994) (To show standing, a plaintiff must "clearly demonstrate[ ] an 'injury in fact' ... *traceable* to the challenged action[.]" (emphasis added)). We do not believe that the injury as pled in this case—namely, the Cieris' incurring repair costs for the plumbing problems purportedly undisclosed by the defendants—occurred "as a result of," or is "fairly traceable" to, Query's allegedly fraudulent representations regarding Query's capacity to serve as the Cieris' broker in a transaction where she also represented the seller.

Finally, as evinced by the scope and character of the interrogatories on the special verdict form, the issue of dual agency or allegedly fraudulent statements made by Query relating to her solicitation of the Cieris was not before the jury. For example, all interrogatories on the special verdict form relating to breach of contract, misrepresentation, fraud, and deceptive acts or practices fall under the general heading of "claims relating to plumbing." Moreover, the interrogatory regarding the amount of damages on the special verdict form provides: "What is the amount of Plaintiffs' damages as a result of the breach of contract, fraud, and/or deceptive acts or practices *relating to the plumbing of the home?*" (Emphasis added.)

### c. The Cieris Have Standing as "Consumers" Because They "Committed Money in a Personal Investment."

█ The Cieris also maintain that they qualify as "consumers" under HRS § 480–1 because they committed money in a "personal investment." The dispositive question, therefore, is whether real estate or residences qualify as "personal investments" as the term is used in HRS § 480–1. Based on a review of the statutory language and the legislative history, we answer in the affirmative and hold that, by purchasing the home at issue in the present case, the Cieris committed money in a personal investment, and accordingly have standing as "consumers."

█ It is well settled that, when construing a statute, this court's "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Crosby v. State Dep't. of Budget & Fin.,* 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994) (citation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995). Moreover, "[w]here the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *State v. Ramela,* 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994) (citation omitted).

"Invest" is defined in pertinent part as "to put (money) to use, by purchase or expenditure, in something offering profitable returns, esp. interest or income." *The Random House College Dictionary,* at 702 (Rev. ed. 1979). We believe that, as previously noted, real estate is, particularly in Hawai'i, both scarce and expensive. As a result, the purchase of real estate or a residence likely is the largest "investment" a person in Hawai'i may make in a lifetime.

We further believe that, contrary to Query's contentions, real estate may be purchased with an intent to reside on the parcel of property and, concurrently, with an intent to hold the property in anticipation of an appreciation in the parcel's resale value. Accordingly, absent legislative intent to the contrary, we believe the plain and obvious meaning of the term "personal investment" includes real estate or residences.

As previously noted, in 1987, the legislature amended HRS chapter 480 to allow suits based on unfair or deceptive acts or practices under HRS § 480–2 to be brought only by consumers, the attorney general, or the office of consumer protection. HRS § 480–1's definition of "consumer" was amended to include "a natural person who, primarily for personal, family, or household purposes ... *commits money, property. or services in an investment.*" The legislative history, however, did not provide any insight as to the legislature's intent regarding the scope of the term "investment."

■ In 1990, the legislature amended HRS § 480–1 by adding the word "personal" to modify the term "investment." As amended, the section provides that a "consumer" is a "natural person who ... commits money, property, or services in a *personal* investment." HRS § 480–1 (Supp.1992) (emphasis added). The relevant legislative history provides that:

> The purpose of this bill is to amend Section 480–1, Hawaii Revised Statutes, by changing the definition of "consumer."

> Your Committee heard testimony in favor of this bill from an attorney in private practice. He testified that the reference to "investors" in the definition of "consumer" has been subject to two Ninth Circuit Court of Appeals cases, both of which held that the Legislature did not intend that investment matters were covered in antitrust cases. He further stated his view that the inclusion of investors in either a consumer protection or anti trust act created a paradox, since investment matters are subject to Chapter 485 and, therefore, investment matters should not be intermingled in an antitrust or consumer protection law.

> The Department of Commerce and Consumer Affairs (DCCA), the Honolulu Police Department (HPD), and another attorney in private practice opposed this bill.

> The DCCA testified that the definition of "consumer" in Chapter 480 was a distinct approach to consumer protection, and that the word "investment" was not restricted to securities, but includes other types of ventures.

> . . . .

> Background information was given for the definition [of "consumer"] by an attorney who stated that when the definition of "consumer" was formulated, the Office of Consumer Protection (Division of DCCA) wanted to insure that people who had invested in bogus financial schemes would be covered by Section 480–2. An example is the Ronald Rewald investment case.[15] He further stated that although he believed that businesses fighting other businesses should not be able to use consumer fraud statutes against one another, unsophisticated and potentially gullible consumers should be protected from investment fraud situations by recourse to the remedies in Section 480–2.

> *Your Committee believes that one of the purposes for the definition of "consumer", as formulated in Section 480–2, was to address the consumer investment fraud situation, such as the Rewald situation. However, the language of the definition may be overbroad and not limited to situations of investment fraud schemes to consumers.* Therefore, your Committee has amended the bill by inserting the word "personal" before the word "investment" to clarify that the provision is to protect individual consumers, rather than businesses.

Hse.Stand.Comm.Rep. No. 716–90, in 1990 House Journal, at 1113 (emphasis added). Query argues that the import of the legislative history was to emphasize that securities were included within the scope of the term "investment." We agree. However, the legislative history does not evince an intent on the part of the legislature to *preclude* the inclusion of real estate or residences within the scope of the term "investment." Moreover, HRS chapter 480 is a remedial statute, which is "to be construed liberally in order to accomplish the purpose for which [it was] enacted.... Remedial statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy." *Dawes v. First Ins. Co. of Hawai'i, Ltd.*, 77 Hawai'i

---

15. The Rewald investment case revolved around a pervasive local "pyramid" investment scheme in which earlier investors were paid with money obtained from subsequent investors. *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 69 Haw. 523, 525, 751 P.2d 77, 78 (1988). In *Rewald*, Bishop, Baldwin, Rewald, Dillingham & Wong, Inc. (the Rewald firm) held itself out as "one of Hawaii's oldest and largest privately-held international investment and consulting firms" dealing only in "secured, safe, non-risk" investments. The Rewald firm was incorporated in 1979 and fifty percent of its stock was held by Ronald Rewald, who was the chairman of its board of directors and its treasurer. The remaining fifty percent was held by Sunlin Wong, its president. The Rewald firm guaranteed its investors a minimum twenty percent annual return on investments, and gathered more than twenty million dollars in five years, investing only a fraction of what was received.

117, 123, 883 P.2d 38, 44, (citation and some brackets omitted), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994). Based on the foregoing, we hold that real estate or residences qualify as "personal investments" pursuant to HRS § 480–1. Accordingly, the Cieris qualify as "consumers" who "committed money in a personal investment," and therefore have standing to sue under HRS chapter 480.[16]

**B. *The Eastern Star Case and the "Greater Amount" of Recovery***

**1. A Choice of Remedies**

Having concluded that the Cieris qualify as "consumers" and have standing to sue under chapter 480, we next address the choice of remedies issue raised by *Eastern Star.* In *Eastern Star,* the ICA held that:

> Despite our holding above [that 480–2 does not supersede common law fraud], we agree ... that an award of both treble damages and punitive damages for the same act constitutes improper double recovery.... [T]he recovery should be either treble damages *or* punitive damages, whichever is the greater amount.

6 Haw.App. at 142, 712 P.2d at 1159–60 (citations omitted and emphasis in original).

Under *Eastern Star,* a plaintiff proving both fraud and unfair or deceptive acts or practices violations of HRS § 480–2 cannot recover for fraud and punitive damages, on the one hand, and treble damages, on the other; rather, the plaintiff must elect a remedy. By so holding, *Eastern Star* restates well-settled law and is consistent with both state and federal court interpretations of state unfair practices statutes and federal antitrust laws. *See, e.g., Hale v. Basin Motor Co.,* 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) ("recovery of both statutory treble damages and punitive damages based upon the same conduct would be improper.... Here, the possibility was open to the court to consider both treble damages under the Unfair Trade Practices Act and, if proven, a punitive damage award for fraud. The [plaintiffs] could accept the greater of the

two awards."); *Fineman v. Armstrong World Indus.,* 980 F.2d 171, 218 (3d Cir.1992) ("[plaintiff] must elect between recovering under either tort law with any punitive damages or under its antitrust claim with its treble damages."), cert. denied, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *see also* Annotation, *Plaintiff's Rights to Punitive or Multiple Damages When Cause of Action Renders Both Available,* 1 A.L.R.5th 449 (1992 and Supp.1994).

Applying these principles to the present case, we face two issues: (1) whether statutory attorneys' fees are included in determining the "greater amount" of recovery; and (2) if so, whether the Cieris are precluded from obtaining the greater amount under the election of remedies doctrine. We address each issue in turn.

**2. Statutory Attorneys' Fees As A Portion of Recovery**

Query, relying on a literal interpretation of *Eastern Star,* argues that the trial court had no choice but to award damages for the common-law count ($3,626.00 for fraud plus $7,950.00 for punitives, for a total of $11,-576.00) because the total is greater than the statutory treble damages ($3,626.00 trebled, or $10,878.00). She argues that the ICA was aware that statutory attorneys' fees were awardable, but made no mention of such fees in *Eastern Star.*

On the other hand, the Cieris argue that under HRS § 480–13(b)(1), attorneys' fees are mandatory. *See* HRS § 480–13(b) ("the plaintiff *shall* be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, *and reasonable attorneys' fees together with the costs of suit.*" (emphasis added)). They maintain that the reasoning expressed in *Eastern Star* indicates that the court should base the award to the plaintiff on whichever theory results in a greater amount of recovery, and mandatory attorneys' fees necessarily comprise a portion of the statutory recov-

---

**16.** Having concluded that the Cieris have standing to sue under HRS chapter 480 and that the trial court properly applied HRS chapter 480 to the present case, we need not reach the Cieris' argument that they are "indirect purchasers" and thus qualify as "consumers."

ery for purposes of calculating the "greater amount" of recovery. We agree.

In *Town East Ford Sales v. Gray*, 730 S.W.2d 796 (Tex.Ct.App.1987), the Texas Court of Appeals faced precisely the same issue. In that case, the plaintiff, who had purchased an automobile, brought suit for common-law fraud and statutory unfair practices against the seller and prevailed. In resolving the same choice of remedy issue on appeal, the *Town East* court noted that it "must decide whether we may consider attorney's fees and court costs in determining which cause of action affords [plaintiff] the greater relief." *Id.* at 812. The court reasoned that, because attorneys' fees and costs are mandatory when a consumer prevails under the Texas Deceptive Trade Practices Act (DTPA), such fees and costs "are considered a part of the consumer's relief under the statute." *Id.* Therefore, the court held that, "for the purposes of determining which cause of action affords the greater recovery, we may consider attorney's fees as part of the consumer's recovery under the DTPA." *Id.* The court accordingly awarded statutory treble damages and fees and costs of $51,869.31, which exceeded the common law fraud award of $4,906.05 in actual damages plus $15,-000.00 in punitive damages.

Similarly, in *Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vermont*, 845 F.2d 404 (2d Cir.1988), *aff'd*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the United States Court of Appeals for the Second Circuit affirmed an award of over $6,000,000.00 in punitive damages on a state law tort claim for intentional interference with contractual relations because the award exceeded the $153,438.00 in treble damages and $212,500.00 in attorneys' fees and costs under 15 U.S.C. § 15. *Kelco* presents the opposite factual situation from the present case: the common law tort claim provided the higher recovery. In denying an award of

attorneys' fees on the tort/punitive damages claim, the *Kelco* court reasoned that:

> Where, as here, the prevailing party elects a remedy provided by state law, and thereby forgoes its treble damage award, it should forgo the entire remedy provided by federal law, including attorneys' fees. *Attorneys' fees are an integral member of the federal remedy....* In any event, its $6 million dollar punitive damage award should provide an adequate fund from which [plaintiff] may pay its attorneys' fee without discomfiture.

*Id.* at 411 (emphasis added).

We agree with the rationale as set forth in the line of authority represented by *Town East* and *Kelco*. As correctly noted by the Cieris, under Hawaiʻi's statutory scheme, awards of attorneys' fees are mandatory. We therefore hold that the trial court properly included the amount of attorneys' fees in the calculation of the greater amount of recovery. Thus, pursuant to *Eastern Star*, because the trial court's award of $10,878.00 in treble damages, $12,252.00 in attorneys' fees, and $851.36 in costs, exceeds $11,576.00, ($3,626.00 for fraud plus $7,950.00 in punitive damages), the trial court's judgment based on the Cieris' statutory unfair practices claim was proper.[17]

### 3. The Cieris' Are Not Estopped From Recovering Statutory Damages and Attorneys' Fees

Query argues that, under the election of remedies doctrine, the Cieris irrevocably chose to recover under the common law, and by so doing, they either waived, or are estopped from, obtaining statutory damages and attorneys' fees. We disagree.

Query asserts that the Cieris' counsel "elected" recovery under the fraud count at the May 7, 1993 hearing on the motions to alter judgment. The transcript of the hearing provides in pertinent part:

---

17. We further agree with the Cieris' contention that *Eastern Star* differs procedurally from the present case in that, in *Eastern Star*, the trial court's verdict contained no fraud award and only a statutory award. The ICA thus had no choice but to remand for retrial on the fraud count. In contrast, the verdict in the present case contains findings both as to fraud and statutory recovery. Therefore, unlike *Eastern Star*, we need not remand the present action to the trial court for further proceedings. We need only affirm the trial court's judgment based on the jury's award on the statutory claim.

The Court: You've read [Query's counsel's] Motion for [JNOV]?

Cieris' counsel: Yes, I have.

The Court: And ... he addresses the issue of the judgment amount. And he does some analysis based upon the Eastern Star case, all right.

Cieris' counsel: That's correct, Your Honor.

The Court: Do you disagree with his interpretation?

Cieris' counsel: Your Honor, I don't disagree with the interpretation, however, there is still a question regarding, I believe, Eastern Star states that treble damages or punitive damages, the greater of the two would be awarded. In that sense, I would agree with the decision.

The Court: So what is your position as to what the judgment should be? In your memoranda it seems that you're still asking for both punitive and treble.

Cieris' counsel: We would revise that somewhat to bring it into line with the decision in Eastern Star and request that the amendment be that the punitive damages be awarded pursuant to the jury verdict as it is the greater of the amount awarded as treble damages.

The Court: Okay. So what is the amount that you believe that you should be awarded in the judgment?

Cieris' counsel: Okay. The special damages award of $3,650 plus punitive damages of $7,950.

The Court: All right. So you're saying that it should be the total of .$11,576?

Cieris' counsel: That's correct, Your Honor.

. . . .

Cieris' counsel: Your Honor, just to clarify that point, nothing has been withdrawn regarding the treble damages portion, it is just that if the punitive damages are not awarded to plaintiff then the treble damages award should stand.

The Court: All right. It's not my understanding that he's withdrawing anything.

All right. With regard to Plaintiff's Motion to Alter or Amend the Judgment, the motion is granted insofar as the judgment shall be amended to reflect an award in the amount of $11,576 which reflects the total of the special damages of $3650, and the punitive damages of $7,950, which sum is greater than the treble damages. The treble damages being $10,878.

As noted previously, the trial court later reversed itself and awarded the treble damages and attorneys' fees.

Query argues that the Cieris' attorney only requested statutory recovery after he realized that he could not recover attorneys' fees on the fraud claim. She contends that the Cieris chose their remedy and cannot vacillate between inconsistent positions and remedies.

 The equitable doctrine of election of remedies is "not a rule of substantive law but rather is a technical rule of procedure or judicial administration." *Airgo v. Horizon Cargo Transp.*, 66 Haw. 590, 593, 670 P.2d 1277, 1280 (1983) (quoting 25 Am.Jur.2d *Election of Remedies* § 1 (1966)).

[E]lection of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same state of facts. Ordinarily a plaintiff need not elect, and cannot be compelled to elect between inconsistent remedies during the course of trial.... If, however, a plaintiff has *unequivocally and knowledgeably* elected to proceed on one of the remedies he [or she] is pursuing, he [or she] may be barred recourse to the other.... [The doctrine] acts as a bar precluding a plaintiff from seeking an inconsistent remedy as a result of his [or her] previous conduct or election.

*Wallis v. Superior Court,* 160 Cal.App.3d 1109, 1114, 207 Cal.Rptr. 123 (1984) (emphasis added and internal citations omitted).

■ Reviewing the "election" by the Cieris' counsel, it can hardly be said that he chose "unequivocally and knowledgeably." The Cieris' counsel specifically noted that "nothing has been withdrawn regarding the treble damages portion," and the court agreed that "[i]t's not my understanding that he's withdrawing anything." The election was thus not "unequivocal."

■ Furthermore, prior to this opinion, whether attorneys' fees were considered as part of the statutory recovery for purposes of the choice of remedies was unsettled under Hawai'i law. Moreover, the trial court itself changed its decision twice, ultimately arriving at the correct conclusion. Therefore, the election was also not "knowledgeable." Accordingly, we hold that the Cieris are not estopped from recovering under their statutory claim.

## C. *Sufficiency-of-Evidence Issues*

### 1. **Fraud and Punitive Damages**

Query next argues that the trial court erred in denying her motion for JNOV, or in the alternative, for new trial, asserting that there was no legal or factual basis to support a verdict for punitive damages or a finding of fraud. Because we have held that the trial court properly entered judgment on the HRS chapter 480 claim and not the common-law fraud count, we need not reach these issues. Moreover, Query does not appeal the jury's specific finding that her behavior was "a deceptive act or practice" distinct from a finding of fraud.

### 2. **Special Damages**

■ Query next argues that the trial court erred in denying her motion for JNOV or for new trial because the jury erroneously calculated the amount of special damages. The jury awarded the Cieris $3,626.00, which represents the expenses from the sewer breakdown incurred by the Cieris after moving in, including costs of food and living expenses incurred while the sewer was being repaired.[18] Receipts were submitted for each expense. Query argues that it was clear from the testimony in the case and the conduct of the Cieris during the case that the food expenses were, at best, distorted and, at worst, fabricated. We disagree.

Query claims that the special damages should be $3,388.72 (as opposed to $3,626.00), but bases the difference on exhibits that were not submitted into evidence. If the exhibits were not submitted, the jury should not have considered them in making the award. However, defendant's exhibit A–8, which was admitted into evidence and available for the jury to consider, indicates that the Cieris' damages were $3,625.89. We hold that the jury's verdict is supported by substantial evidence.

### 3. **Amount of Attorneys' Fees**

■ Finally, Query contests the amount of attorneys' fees awarded by the trial court under HRS § 480–13(b)(1). The reasonableness of an award of attorneys' fees is reviewed for abuse of discretion. *Booker v. Midpac Lumber Co., Ltd.*, 65 Haw. 166, 171, 649 P.2d 376, 380 (1982).

Query questions the form of the billing sheets, essentially arguing that the entries are not detailed enough. She also argues that the amount of $12,252.00 is disproportionate to the actual award of special damages of $3,626.00. Query notes that the Cieris did not prevail against Leticia Query Realty, Inc., Mr. Yamaji, or Mrs. Yamaji. Thus, she argues that the fees should be limited to twenty-five percent of the amount requested, at most.

■ Subsequent to the trial, the Cieris' counsel submitted verified affidavits and standard billing sheets for attorneys' fees of $22,475.00, as well as an additional $4,468.81 for fees generated by the Cieris' previous counsel. The trial court apparently reduced the amount sought by half, treating Mr. and Mrs. Yamaji as one party, and the Query entities as another. Because the Cieris prevailed against Query but not against the Yamajis, it was proper, although not required,

---

**18.** The jury chose not to award $6,800, representing the cost of replacing the entire sewer line.

for the trial court to have reduced the fee recovery by fifty percent. *See, e.g., Reazin v. Blue Cross and Blue Shield,* 899 F.2d 951, 980 (10th Cir.) (under antitrust laws, such apportionment is not required), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). With respect to Query's claim of disproportionality, contrary to her argument, the amount of fees need not be restricted to the amount of actual damages. *Cf. Kelco,* 845 F.2d 404 (2d Cir.1988), (statutory award of $153,438.00 in treble damages and $212,-500.00 in attorneys' fees and costs under 15 U.S.C. § 15), *aff'd,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Thus, we hold that the trial court did not abuse its discretion in awarding the Cieris' attorneys' fees.

## III. *CONCLUSION*

For the foregoing reasons, we affirm the judgment of the trial court.