949 P.2d 1026

**Thomas J. DAVIS, Plaintiff–Appellant/Cross–Appellee,**

v.

**WHOLESALE MOTORS, INC., a Hawai'i corporation, Defendant–Appellee/Cross–Appellant,**

**and**

**George Garrid Ford and Raymond D. Miranda, Defendants.**

No. 18656.

Intermediate Court of Appeals of Hawai'i.

Dec. 12, 1997.

As Amended Dec. 19 1997 and Jan. 13, 1998.

Certiorari Denied Jan. 23, 1998.

Charles S. Lotsof, on the briefs, Honolulu, for plaintiff-appellant/cross-appellee.

Mark T. Shklov, Stuart M. Cowan, and John Harris Paer, on the briefs, Honolulu, for defendant-appellee/cross-appellant.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

I.

We hold that in an action by a consumer alleging unfair or deceptive acts or practices in the conduct of any trade or commerce, in violation of Hawai'i Revised Statutes (HRS) § 480–2 (1993), the "unclean hands" of the consumer is not a defense to a claim for damages under HRS § 480–13(b)(1) (1993). The first circuit court (the court) ruled to the contrary, and awarded Plaintiff–Appellant/Cross–Appellee Thomas J. Davis (Plaintiff) damages against Defendant–Appellee/Cross–Appellant Wholesale Motors (Wholesale Motors) on the theory of an implied "contract in law" in this putative automobile sale case. Therefore, in this appeal by Plaintiff from the December 8, 1994 amended judgment, the original judgment, and various orders entered by the court and in the cross-appeal by Wholesale Motors, we vacate that part of the December 8, 1994 amended judgment awarding Plaintiff damages against Wholesale Motors and remand for the court to determine if Plaintiff proved the elements necessary to recover under HRS § 480–13(b)(1) as set forth herein. In this regard, on remand we instruct the court to permit Plaintiff to conform his complaint to the evidence produced at trial concerning Wholesale Motors' alleged misrepresentations.

We also vacate the court's finding as to the misrepresentations of the wholesale value of Plaintiff's traded-in Pontiac and remand for a new determination of this issue and of the basis for excluding from trial Wholesale Motors' expert witness on the Pontiac's value.

We do uphold that portion of the amended judgment awarding $1200.68 in damages to Wholesale Motors, for we conclude that even if Plaintiff may recover damages under HRS § 480–13(b)(1), setoffs to damages awarded under this statute are permissible under the circumstances present in the instant case. Furthermore, we conclude that any trebling of damages pursuant to this statute must occur *before* setoffs are applied to the damage award.

With respect to the other points of Wholesale Motors' cross-appeal, we see no error in the court's entry of the amended judgment, its refusal to disqualify Plaintiff's counsel, or its conclusion that an employer may be held liable for ratifying and condoning wrongful acts of its employees.

Finally, we remand to the court to determine Wholesale Motors' Hawai'i Rules of Civil Procedure (HRCP) Rule 68 motion for costs, as appropriate.

II.

On February 21, 1992, Plaintiff negotiated with Defendants George Garrid Ford (Ford) and Raymond D. Miranda (Miranda), employees of Wholesale Motors, for the purchase of a 1990 Chevrolet Corvette (Corvette). When Plaintiff inquired about the Corvette, Ford acknowledged he told Plaintiff that the "list price" of the Corvette was "$31,995 plus fee." Ford also reported he told Plaintiff that the value of Plaintiff's 1989 Pontiac Grand Prix (Pontiac) was $6000.

Later that evening, Plaintiff entered into a "Purchase Agreement" for the Corvette with JN Chevrolet Mazda.[1] The Purchase Agreement stated that the selling price of the Corvette was $31,995, and the total cash price including fees and sales tax was $33,053.04. Plaintiff gave Wholesale Motors a $5000 check[2] and traded in the Pontiac pursuant to the Purchase Agreement. The "Credit Sale Contract," which Plaintiff also signed, listed the total down payment as the

1. JN Chevrolet Mazda is one of the trade names of Defendant–Appellee/Cross–Appellant Wholesale Motors, Inc. (Wholesale Motors).

2. According to the testimony of Eli Abordo (Abordo), an assistant manager at Wholesale Motors, Abordo understood at the time of the transaction involving Plaintiff–Appellant/Cross–Appellee Thomas J. Davis (Plaintiff) that Plaintiff's check was to be held for approximately one week before being cashed.

cash down payment ($5000) plus the "net trade-in" ($12,995). The Purchase Agreement and the Credit Sale Contract stated that both documents were "subject to lender's credit approval."

Plaintiff also signed a "Completion Agreement" with Wholesale Motors. By his signature, Plaintiff acknowledged several sections of the Completion Agreement, including (1) a statement that repairs would be at Plaintiff's expense; (2) a "special terms and conditions" section; and (3) a merger clause declaring the agreement to be a complete and final written expression of the parties' agreement.

The special terms section of the Completion Agreement stated that the "customer understands that they are [sic] receiving $6495 overallowance on their trade-in. Price shown on purchase agreement ($12,995) reflects above overallowance. Actual cash value on [']89 Pont. Lic. # EGR–042 is $6500.00. Actual sales price is $25,500 [']90 Corvette." The values were handwritten in blanks on the form agreement.

Plaintiff took possession of the Corvette on February 21, 1992.

The purchase was not finalized for several reasons. During the purchase transaction, Plaintiff told Wholesale Motors that he owned the Pontiac and did not owe any money on it. Plaintiff also signed a Purchase Agreement provision representing that there were no liens on the trade-in vehicle. In fact, Plaintiff had given title to the Pontiac as security for another loan earlier that same day, although Plaintiff claimed he did not realize that fact at the time because he had not read the documents he signed. Also, Plaintiff lacked sufficient checking account funds to cover his $5000 check, even after the period of time the check was to be held.[3]

Wholesale Motors' finance manager testified he did not believe there would be any problem in obtaining financing. At that time, the finance manager assumed that the $5,000 check would be paid and the Pontiac was unencumbered. The finance manager affirmed that it would have been "almost impossible" to obtain financing for Plaintiff without the $5,000 down payment or the trade-in.

Wholesale Motors attempted to obtain financing through General Motors Acceptance Corporation (GMAC) but GMAC refused to extend credit to Plaintiff.[4] Wholesale Motors also attempted to obtain financing from Mazda American Credit, which refused financing due to Plaintiff's insufficient income.

Plaintiff had possession of the Corvette for ten days. Wholesale Motors offered to allow Plaintiff to retain the Corvette on the condition he tender approximately $5000 more for the down payment, but Plaintiff could not pay that amount. Plaintiff returned the Corvette to Wholesale Motors on March 2, 1992.

Plaintiff drove the Corvette 1200 miles during the ten days he had possession of it. Although the Corvette had been in immaculate condition when Plaintiff received it, Plaintiff returned the Corvette "caked" with red dirt on the outside and inside of the vehicle. An employee of Wholesale Motors observed that the car looked as if it had been "abused" and possibly driven "off road." A wheel rim on the Corvette was bent, but Plaintiff claimed that he did not cause the damage.

In addition to retaking possession of the Corvette, Wholesale Motors also retained Plaintiff's traded-in Pontiac. Wholesale Motors justified this action on the terms of the Completion Agreement, which provided that "if [Plaintiff] fail[ed] to complete this transaction, JN, at its option, shall have the right to cancel this order and retain the advance deposit and/or down payment [for] up to 20% of

---

**3.** Plaintiff made other misrepresentations in his transaction with Wholesale Motors. Wholesale Motors learned during discovery that Plaintiff inflated his monthly income on his credit application. Plaintiff admitted on cross-examination that the amounts listed as balances in his checking and saving accounts on the credit application were not correct either, but Plaintiff denied that he provided Wholesale Motors with that information. These misrepresentations were not discov-

ered by General Motors Acceptance Corporation (GMAC) and hence not material to GMAC's denial of credit. *See* discussion *infra*.

**4.** GMAC cited Plaintiff's delinquent credit experience, insufficient income, recent credit inquiries, and finance company reference score as the reasons for denying credit to Plaintiff.

the purchase price[5] as liquidated damages for its loss of profit." The Credit Sale Contract listed the "Total Downpayment" as equal to the "Net Trade-in [of] $12[,]995.00 + Cash Downpayment [of] $5000.00." The Completion Agreement provided for "vehicle damage and usage while in [Plaintiff's] possession [to] be charged to [Plaintiff] if [the] transaction [was] not completed."

### III.

#### A.

On April 1, 1992, Plaintiff filed a complaint against Wholesale, Ford, and Miranda (collectively Defendants) alleging conversion of his Pontiac, breach of contract, fraud, and various "unfair and deceptive practices in trade or commerce" under HRS chapter 480.[6] Plaintiff claimed that Ford and Miranda misrepresented Plaintiff's ability to obtain financing, the retention of the Pontiac if the transaction was not completed, the "Blue Book"[7] value of the Corvette, and the fairness of the Corvette's price. Plaintiff also alleged that Defendants did not provide Plaintiff with a copy of the Completion Agreement and that Defendants altered the Completion Agreement after Plaintiff had signed it. According to the complaint, the acts of Ford and Miranda were done within the scope of their employment with Wholesale Motors, and such acts "were condoned, ratified, facilitated, aided and encouraged by the officers, directors, managers and policy-makers of [Wholesale Motors]." Plaintiff sued for general damages, treble damages, punitive damages, attorney's fees and costs,

and an injunction against future unfair and deceptive trade practices.

Wholesale Motors filed a counterclaim against Plaintiff alleging fraud, breach of contract, negligence, and malicious conduct[8] and requesting general, special, liquidated, and punitive damages as well as attorney's fees and costs. Also, Wholesale Motors sought an order permitting it to retain the Pontiac in order to satisfy its claims against Plaintiff.

#### B.

On July 15, 1992, Plaintiff moved for summary judgment or partial summary judgment on the following propositions: (1) Defendants breached the contract by retaining the Pontiac; (2) Defendants' retention of the Pontiac was an unfair and deceptive trade practice; (3) Plaintiff was entitled to treble damages and attorney's fees under HRS chapter 480; (4) Plaintiff's damages were three times the fair market value (FMV) of the Pontiac; (5) the FMV of the Pontiac was as appraised by Lionel M. Ahina (Ahina) (or, alternatively, Plaintiff's damages should be measured by the amount Plaintiff paid for the Pontiac); and (6) Defendants were not entitled to attorney's fees.

The motions court denied Plaintiff's motion for summary judgment, finding that there were "numerous questions of material fact regarding the transaction." Plaintiff filed a motion to reconsider. In a March 8, 1993 order, the motions court granted in part and denied in part Plaintiff's motion to reconsid-

---

5. It is not stated in the Completion Agreement whether the term "purchase price" referred to the "actual sales price" of $25,500 written on the Completion Agreement, or the "selling price" of $31,995 written on the Purchase Agreement.

6. Although Plaintiff did not specify in his complaint that each of his unfair and deceptive trade practice claims was brought under Hawai'i Revised Statutes (HRS) chapter 480, at the beginning of his complaint, Plaintiff cited the definitions of "merchants" and "consumer" under "the [Hawai'i] unfair and deceptive trade practices law, [HRS] [c]hapter 480." Furthermore, Plaintiff's arguments on summary judgment and on appeal all relate to HRS chapter 480 for his unfair and deceptive trade practice claims. Thus, we treat such claims as being brought

under HRS chapter 480, entitled "Monopolies; Restraint of Trade," rather than under HRS chapter 481A, Hawai'i's Uniform Deceptive Trade Practices Act.

7. The Kelley Blue Book Auto Market Report, published eleven times per year, provides values for different types of used and older cars. The Blue Book issue relevant to this case is *Kelley Blue Book, Used Car Guide: 1986–1992 Models*, Jan.–Feb. 1992.

8. The court filed an entry of default against Plaintiff as to Wholesale Motors' counterclaim because Plaintiff failed to answer the counterclaim. This entry of default was set aside pursuant to stipulation of the parties.

er, ruling that the Pontiac "was not to have been held by the Defendants" [9] and that "the value of the appraisal submitted by Plaintiff [was] the only competent evidence" of the Pontiac's value. Plaintiff's motion was denied as to all other issues.

Defendants then filed a motion to reconsider the motions court's March 8, 1993 order, urging that the original order denying Plaintiff's motion for summary judgment be reinstated. On June 15, 1993, the motions court denied Defendants' motion with respect to "Defendants' right to hold the [Pontiac]" [10] but granted it with respect to the Pontiac's appraisal. The motions court indicated that the FMV of the Pontiac should be decided "on [a] subsequent motion or by the trier of fact[.]" Thus, the motions court determined as an established fact for trial that Defendants had wrongfully retained Plaintiff's Pontiac.[11]

A second motion by Plaintiff for summary judgment on the unfair trade practice issue was denied.

On January 24, 1994, Plaintiff filed a motion for leave to amend his complaint to add allegations explaining that his denial of credit was based on the face of his application and not the discovery of any of his misrepresentations [12] and to increase the amount of damages to conform to Ahina's valuation of the Pontiac. The court granted the motion on March 18, 1994.

After trial, Plaintiff moved to amend his complaint to conform it to the evidence pro-duced at trial. Plaintiff sought to add two additional claims alleging that Defendants misrepresented to him that the Pontiac's wholesale Blue Book value was $6,000 and that the Corvette's price was $31,995. According to Plaintiff, these misrepresentations were not understood until after Ford's deposition was taken, during the trial. The court denied Plaintiff's motion to amend on May 4, 1994.

### C.

The court entered its findings of fact (findings) and conclusions of law (conclusions) on April 29, 1994. The following findings are relevant to our disposition of this appeal:

12. In the events immediately leading to, surrounding the, and at the time of the transaction on February 21, 1992:

a. Plaintiff made these material representations with intent to induce and deceive [Wholesale Motors] to enter into the sale/purchase transaction[:]

1. his finances, debts, assets and credit status on the credit application;

2. that he had adequate ability to make good the personal check within a week;

3. that he had free and clear title to the [Pontiac] when in fact he knew that AVCO had a lien on the vehicle;

9. The motions court did not use the term "conversion" in its March 8, 1993 order. During the October 28, 1992 hearing on Plaintiff's motion to reconsider, the motions court asked Plaintiff's counsel whether the court "would be making a finding of conversion if [it] ruled in [Plaintiff's] favor" and Plaintiff's counsel responded, "Yes."

10. Again, the motions court did not use the term "conversion" in its June 15, 1993 order.

11. Plaintiff argues that under the doctrine of "law of the case," the court should not have overruled the motions court's award of partial summary judgment on the issue of Wholesale Motors' retaining the Pontiac.
The general rule which requires adherence to a prior interlocutory order of another judge of the same court ... commands even greater respect than the doctrine of "law of the case" which refers to the usual practice of courts to

refuse to disturb all prior rulings in a particular case, including rulings made by the judge himself [or herself]. Unless *cogent reasons* support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion.
*Wong v. City & County of Honolulu*, 66 Haw. 389, 396, 665 P.2d 157, 162 (1983) (italics in original) (citations omitted). However, we do not address this issue because we do not address the question of whether Wholesale Motors' retention of the Pontiac constituted conversion. *See* discussion *infra* part VIII.

12. Plaintiff apparently sought to demonstrate that his misrepresentations on the credit application were not discovered by GMAC and Mazda American Credit in making their credit decisions.

b. [Wholesale Motors] made material misrepresentations with the intent to induce and deceive Plaintiff to enter into the sale/purchase transaction:

1. *That the list price of the Corvette was $31,995.00 when in fact it was $25,500.00;*

2. *That the wholesale value of the [Pontiac] was $6,500.00 when in fact it was $8,875.00.*

13. Both Plaintiff and Defendant [13] deceived each other into entering into the transaction.

. . . .

18. After [Wholesale Motors'] demand that Plaintiff return the Corvette, Plaintiff delivered it to [Wholesale Motors] on or about March 2, 1992. The vehicle was extremely dirty. Plaintiff had received the vehicle in excellent condition since [Wholesale Motors] regarded it as a "high ticket" item. While in Plaintiff's possession, the vehicle had been driven nearly 1200 miles and had sustained damages. [Wholesale Motors] later repaired those damages. The fair and reasonable value of the repairs is $750.68.

. . . .

20. [Wholesale Motors] retained possession of both the Corvette and the [Pontiac], refusing Plaintiff's request that the [Pontiac] be returned to him.

. . . .

23. [in pertinent part] When [Wholesale Motors] retained the [Pontiac], it did so for two purposes:

a. to secure payment of damages; and

b. to retain 20% of its perceived profit pursuant to a liquidated damages clause of the Completion Agreement.

24. *At the time of the transaction and specifically during the period February 21, 1992 through May 2, 1992, the reasonable fair market value of the [Pontiac] was $10,000.00.*

. . . .

26. The reasonable rental value of the Corvette during the period of Plaintiff's possession was $450.00.

(Emphases added.)

The conclusions read, in pertinent part:

1. Because of the material misrepresentations and deception of both Plaintiff and [Wholesale Motors] relevant to the transaction, *either party had the option to void the transaction. By their conduct, they did so. Thus, the transaction is void.*

2. *Since the transaction was void, [Wholesale Motors] was obligated to either return the [Pontiac] to Plaintiff or pay Plaintiff the [FMV] of the vehicle . . .* upon Plaintiff's payment to [Wholesale Motors] of [the reasonable rental value of the Corvette and the cost of repairs to the Corvette].

3. Since Plaintiff never rendered such payments, *it was proper for [Wholesale Motors] to retain the [Pontiac] and attempt to sell it.*

4. *[Wholesale Motors] did not perpetrate a conversion of the [Pontiac].*

5. *The conduct of [Wholesale Motors] through its employees, agents and representatives and the conduct of Plaintiff were reprehensible, grossly unfair, and deceptive.* Essentially, they were attempting to "cheat" each other. *[Wholesale Motors] authorized, ratified, and approved of the conduct and representations of its employees, agents, and representatives, inclusive of . . . Ford and Miranda.* Consequently, . . . Ford and Miranda are not liable to Plaintiff.

*[Wholesale Motors] may not be held liable to Plaintiff on a claim of unfair or deceptive trade practice; i.e., [HRS § 480–2]. Plaintiff was not an "innocent" consumer.* He too engaged in unfair and deceptive acts, representations, and practices with respect to the transaction[.]

. . . .

---

13. The court did not specify which defendant it was referring to in this finding of fact (finding), but we assume from finding 12 that the reference to "Defendant" in finding 13 was to Wholesale Motors.

7. Since Plaintiff and [Wholesale Motors] voided the transaction, neither may sustain a claim for breach of contract.

. . . .

10. *To the extent that any party may recover damages in this action, the party may do so only by the power of the [c]ourt to imply a contract in law to preclude a party from receiving an unjust enrichment or suffering an unjust detriment.*

Accordingly, the [c]ourt implies a contract of law.

As a result of such [c]ontract, Plaintiff is entitled to receive from [Wholesale Motors] the amount of $8,799.23; to wit, $10,000.00 less: [$450.00, the amount of the reasonable rental value of the Corvette, and $750.68, the cost of repairs to the Corvette].

(Emphases added.) The court also ruled that there was no clear and convincing evidence to support either party's claims of fraud, punitive damages, and intentional misrepresentations, because each party's own "deception and misrepresentations vitiate such claims."

### D.

On May 20, 1994, the court entered judgment in favor of Plaintiff "by virtue of the [c]ourt's implying a contract in law to prevent [Wholesale Motors] from receiving unjust enrichment in the amount of $10,000.00"; in favor of Ford and Miranda on Plaintiff's complaint; and in favor of Wholesale Motors on its counterclaim "by reason of the [c]ourt's implying a contract in law to preclude [Wholesale Motors] from suffering a detriment in the amount of $1,200.68." The court denied each party's request for attorney's fees and costs.

An amended judgment was filed on December 8, 1994.

Plaintiff appealed on January 9, 1995.

Wholesale Motors filed its cross-appeal on January 20, 1995. Wholesale Motors represents that it cross-appealed only to protect itself if the court's judgment were disturbed in any way, because the "net result in this case was proper."

### IV.

Initially, Wholesale Motors argues that this appeal should be dismissed, either as to Ford and Miranda, or in its entirety.

### A.

We need not address Wholesale Motors' first contention.

Plaintiff specifically moved to dismiss all claims against Ford and Miranda in his October 26, 1994 Motion to Dismiss Remaining Claims. Defendants noted that they did not oppose the dismissal of such claims as long as the dismissal was with prejudice. On December 8, 1994, the court granted Plaintiff's motion, .ruling that all claims against Ford and Miranda were specifically dismissed with prejudice. This decision has not been appealed.

Because of the court's dismissal of all claims against them, Ford and Miranda are not parties to this appeal. Hence, we find irrelevant Wholesale Motors' argument concerning dismissal of the appeal as to Ford and Miranda.

### B.

Second, Wholesale Motors urges that this appeal be dismissed entirely because (1) Plaintiff and his counsel "have not been honest with this [c]ourt [and][t]hey have not acted in good faith" and (2) the amended judgment from which Plaintiff appeals was entered erroneously.

### 1.

■ We reject the first contention, since Wholesale Motors merely makes conclusory statements about Plaintiff's alleged dishonesty without pointing to any specific instances of wrongdoing. On this point, Wholesale Motors relies on Hawai'i Rules of Appellate Procedure (HRAP) Rule 38, which states that "[i]f a Hawai'i appellate court shall determine that an appeal decided by it was frivolous, it may award damages including reasonable attorneys' fees and costs to the appellee." We cannot conclude that this appeal is frivolous.

**2.**

We also reject Wholesale Motors' argument that the amended judgment was entered erroneously.

Plaintiff's appeal of the original May 20, 1994 judgment was dismissed on September 7, 1994 as premature because the original judgment was not deemed to be final as to all claims and parties, under the standards of *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994).[14] Specifically, the Hawai'i Supreme Court stated that:

> (1) the claims against ... Ford and Miranda have not been reduced to judgment because *paragraph 1 of the May 20, 1994 judgment did not enter judgment in favor of and against the parties; see M.F. Williams, Inc. v. City and County of Honolulu,* 3 Haw.App. 319, 322, 650 P.2d 599, 603 (1982);
>
> (2) judgment is not final as to all claims and parties; *see Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994); and thus,
>
> (3) this appeal is premature.

(Emphasis added.)

On October 26, 1994, Plaintiff filed his Motion to Dismiss Remaining Claims, moving the court to dismiss his claims against Ford and Miranda and, in a "boilerplate" clause, dismiss all claims that were not specifically addressed in the original judgment. The court incorporated its order granting this motion into an amended judgment and stated that the original judgment must be amended to comply with *Jenkins.* The court thus entered the amended judgment as follows (underscored portions are portions that were not included in the original judgment):

> 1. In favor of ... [Ford] and [Miranda] *and against Plaintiff* on Plaintiff's Complaint *and First Amended Complaint and so that all claims and remedies brought in Plaintiff's Complaint and First Amended Complaint against ... Ford and Miranda are dismissed with prejudice, and Plaintiff shall take nothing with respect to those claims;*
>
> 2. In favor of Plaintiff and against [Wholesale Motors] on the Complaint *and First Amended Complaint* by virtue of the Court's implying a contract in law to prevent [Wholesale Motors] from receiving an unjust enrichment in the amount of $10,000.00;
>
> 3. In favor of [Wholesale Motors] *and* against Plaintiff on [Wholesale Motors'] Counterclaim by reason of the Court's implying a contract in law to preclude [Wholesale Motors] from suffering a detriment in the amount of $1,200.68;
>
> 4. As a result, [Wholesale Motors] has an obligation to pay Plaintiff the amount of $8,799.23;
>
> 5. All parties are responsible and liable for their own attorney's fees and costs; and
>
> 6. *All claims and remedies sought in any of the pleadings herein by any party that are not addressed specifically in this Amended Judgment are dismissed with prejudice, including dismissal of Plaintiff's claim for an injunction, so that all claims brought by and against all the parties hereto have been determined.*

Wholesale Motors maintains that the court treated Plaintiff's October 26, 1994 motion as a motion to amend the original May 20, 1994 judgment pursuant to HRCP Rule 59(e). Under HRCP Rule 59(e), the motion would have been untimely because a HRCP Rule 59(e) motion to alter or amend the judgment must be filed within ten days after entry of the judgment, the motion was not so filed, and a circuit court cannot extend this deadline. *See Escritor v. Maui County Council,* 2 Haw.App. 200, 202, 629 P.2d 1146, 1148 (1981). Thus, the court would not have been

---

14. In *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119–20, 869 P.2d 1334, 1338–39 (1994), the supreme court held that

after March 31, 1994 an appeal from an order that purports to be a final order as to all claims and parties in civil cases may be taken only after the order has been reduced to a judgment in favor of or against the parties.... An appeal from an order that is not reduced to a judgment in favor of or against the party by the time the record is filed in the supreme court will be dismissed.

(Footnotes omitted.)

correct in treating Plaintiff's motion as one under HRCP Rule 59(e).

The court, however, merely stated that it was treating Plaintiff's motion as one to amend the judgment, without specifying the rule on which the court was relying. In our view, the amended judgment was properly entered under HRCP Rule 54(b) or HRCP Rule 60(a).

### a.

We believe that HRCP Rule 54(b) authorized the court to enter the amended judgment. HRCP 54(b) provides, in relevant part:

> [If there is not] an express determination that there is no just reason for delay [and] an express direction for the entry of judgment[,] ... any order or other form of decision, *however designated,* which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and *the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

(Emphases added.)

The supreme court dismissed the appeal from the May 20, 1994 judgment because it found that the claims against Ford and Miranda had not been reduced to judgment, and thus all claims had not been decided. There was neither an "express determination that there is no just reason for delay" nor an "express direction for the entry of judgment" in the May 20, 1994 judgment. Under HRCP Rule 54(b), then, the May 20, 1994 judgment did not terminate this action as to any of the parties and was thus subject to revision. HRCP Rule 54(b) authorized the court on remand to file an amended, and final, judgment adjudicating all of the claims in this case.

### b.

Alternatively, HRCP Rule 60(a) permits a court to correct a judgment for clerical mistakes or errors arising from "oversight or omission ... at any time of [the court's] own initiative or on the motion of any party, and after such notice, if any, as the court orders." HRCP Rule 60(a) does not impose a time limit on when amendments can be made. HRCP Rule 60(a) permits the correction of a judgment "if the intention to include a particular provision in the judgment was clear, but the judge neglected to include that provision." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2854, at 248 (2d ed.1995) (footnote omitted).

We believe the record demonstrates that the court intended to include the amended provisions in the original judgment but merely neglected to do so. Arguably, the amended judgment did not make any substantive changes to the original judgment. Because all claims had been decided originally and this was apparently intended to be reflected in the original judgment, the amended judgment may be treated as falling under HRCP Rule 60(a).

### V.

Finding that we have jurisdiction, we conclude that the court was wrong in its application of HRS chapter 480.

### A.

HRS § 480-2(a) states that "unfair methods of competition and unfair or deceptive trade acts or practices in the conduct of any trade or commerce are unlawful." In conclusion 5, the court determined that the "conduct of [Wholesale Motors] ... [was] reprehensible, grossly unfair, and deceptive." Although not specified in conclusion 5, we assume from finding 12b and conclusions 3 and 4 that Wholesale Motors' misrepresentations as to the list price and wholesale value comprised the "conduct" the court referred to as unfair and deceptive. We note without deciding that if Wholesale Motors misrepresented the list price of the Corvette and/or the wholesale value of the Pontiac to Plaintiff, these misrepresentations could be unfair or deceptive trade acts or practices under

HRS § 480–2.[15] However, the court then concluded that "Wholesale [Motors] may not be held liable to Plaintiff on a claim of unfair or deceptive trade practice [under HRS § 480–2 because] Plaintiff was not an 'innocent' consumer." Conclusions of law are freely reviewable on appeal, *Wharton v. Hawaiian Elec. Co.*, 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995), and in reviewing conclusion 5, we believe the court's reasoning as to why Wholesale Motors was not liable constituted an incorrect application of the law under HRS chapter 480.

■ HRS § 480–13(b)(1) provides that any consumer injured by an unfair or deceptive trade act or practice in violation of HRS § 480–2 may sue for damages.[16] If judgment is for the plaintiff, "the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys [sic] fees together with the costs of suit." HRS § 480–13(b)(1). The elements necessary to recover on an unfair or deceptive trade acts or practices claim under HRS § 480–13(b)(1) are: (1) a violation of HRS § 480–2; (2) injury to the consumer caused by such a violation; and (3) proof of the amount of damages. See *Ai v. Frank Huff Agency*, 61 Haw. 607, 617, 607 P.2d 1304, 1311 (1980); *Cieri v. Leticia Query Realty*, 80 Hawai'i 54, 61–62, 905 P.2d 29, 36–37 (1995); 1987 Haw. Sess. L. Act 274, § 4 at 838.

The court did not make findings as to each of these elements, apparently because it ultimately concluded that Wholesale Motors could not be liable under HRS § 480–13 because Plaintiff lacked clean hands with respect to the transaction. Based on the interpretation of similar federal antitrust legislation, we conclude this rationale is incorrect.

### B.

HRS § 480–2(b) provides that "in construing this section, the courts ... shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission [(FTC)] and the federal courts interpreting section 5(a)(1) of the ... [FTC] Act (15 U.S.C. 45(a)(1)), as from time to time amended." The legislative history of HRS chapter 480 indicates that federal decisions involving comparable provisions of the federal antitrust laws should " 'guide the interpretation and application of such terms and provisions of [HRS chapter 480] in the light of the economic and business conditions of this [s]tate.' " *Ai*, 61 Haw. at 613 n. 11, 607 P.2d at 1309 n. 11 (quoting Conference Comm., C.C. Rep. No. 16, 1st Leg., Reg. Sess., House Journal, at 1075 (1961)).

Our supreme court has noted that section 4 of the Clayton Act is the federal counterpart to HRS § 480–13. *Id.* at 613, 607 P.2d at 1309. According to the U.S. District Court for the District of Hawai'i, the unclean hands defense is precluded in "Clayton 4" damage actions. *Int'l Telephone and Telegraph Corp. v. General Telephone & Elecs. Corp.*, 296 F.Supp. 920, 926 (D.Haw.1969). The U.S. Supreme Court has explained that "the plaintiff who reaps the reward of treble damages [in an antitrust suit] may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competi-

---

**15.** Wholesale Motors disputes finding 12b regarding the misrepresentations of the list price and wholesale value. *See* discussion *infra* part VII. Alternatively, Wholesale Motors maintains that even if finding 12b is correct, Plaintiff did not rely on Wholesale Motors' representations and thus Wholesale Motors cannot be held liable on an unfair or deceptive trade acts or practices claim. Wholesale Motors argues that Plaintiff was a sophisticated consumer and hence did not rely on and was not deceived by any alleged misrepresentations of Wholesale Motors. The Hawai'i Supreme Court has held that actual deception is not required to establish a claim under HRS § 480–2 (1993); all that is required is proof that the defendant's actions "had the capacity to mislead." *State v. U.S. Steel Corp.*, 82 Hawai'i 32, 51, 919 P.2d 294, 313 (1996).

**16.** HRS § 480–13(b)(2) (1993) allows a consumer injured by a violation of HRS § 480–2 to "bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys [sic] fees together with the cost of suit." Plaintiff requested an injunction barring Defendants from further engaging in the alleged unfair or deceptive trade practices, and in the amended judgment, the court dismissed with prejudice Plaintiff's claim for an injunction.

418

tion." [17] *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 765–66, 716, 104 S.Ct. 2731, 2738–39, 81 L.Ed.2d 628 (1984).

■ We find this reasoning persuasive to hold that unclean hands is not a defense to damage actions under HRS § 480–13(b)(1). It is true, as Wholesale Motors argues, that "HRS § 480–2, as its federal counterpart in the FTC Act, was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair[,] or deceptive business practices for the protection of consumers and honest businessmen." *Ai,* 61 Haw. at 616, 607 P.2d at 1311. However, we do not accept Wholesale Motors' interpretation of this language to mean that only consumers with "clean hands" may bring an action for damages under HRS § 480–13(b)(1).[18]

Hence, we concur with Plaintiff's assertion that the court erred in ruling that "Wholesale [Motors] may not be held liable to Plaintiff on a claim of unfair or deceptive trade practice ... [because] Plaintiff was not an 'innocent' consumer." The court should have decided whether HRS chapter 480 was implicated without regard to Plaintiff's conduct. The case, therefore, must be remanded to determine whether Plaintiff has proven the elements necessary to recover under HRS § 480–13(b)(1). Because the case must be remanded, we consider the other points raised in the appeal and cross-appeal.

## VI.

■ We agree with Plaintiff that it was an abuse of discretion for the court to deny amendment of the complaint to conform to trial evidence. Amendment was sought to include allegations that Defendants misrepresented the subject list price and wholesale value. Plaintiff asserts he would have learned of these misrepresentations earlier if Defendants had cooperated in allowing him to take Ford's deposition.[19] Given our disposition of the case, we must address this claim.

■ HRCP Rule 15(b) permits amendments of pleadings to conform to the evidence presented at trial, but a trial court's decision on a HRCP Rule 15(b) motion will not be set aside unless the trial court abused its discretion. *See Hamm v. Merrick,* 61 Haw. 470, 473, 605 P.2d 499, 502 (1980). "An abuse of discretion occurs when the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994) (citation and internal quotation marks omitted).

As noted *supra,* in finding 12b the court made specific findings that covered the scope of Plaintiff's proposed amendments, namely, that Wholesale Motors made material misrepresentations about the list price of the Corvette and the wholesale value of the Pontiac. Evidence relating to such alleged misrepresentations was thus considered by the court. Under these circumstances, the pleadings should conform to evidence received at trial and on remand, the court is

17. An allegation of injury to competition is not necessary to maintain a claim under HRS § 480–13. The Hawai'i Supreme Court has stated that "unlike the Federal Trade Commission Act, the policy of the [Hawai'i] law, as expressed in HRS § 480–13, is to foster private suits grounded on unfair or deceptive trade practices, even where the unlawful acts do not culminate in injury to 'competition.' " *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 301, 627 P.2d 260, 269 (1981).

18. As pointed out in *Ai v. Frank Huff Agency,* 61 Haw. 607, 607 P.2d 1304 (1980), HRS chapter 480 was aimed at "business practices," perhaps in recognition of the federal cases holding that

the doctrine of unclean hands does not provide a defense to damage actions for unfair and deceptive trade practices.

19. In order to remedy the alleged refusal of Wholesale Motors, Defendant George Garrid Ford (Ford), and Defendant Raymond D. Miranda (collectively Defendants) to allow Plaintiff to take Ford's deposition, Plaintiff requested that Ford be precluded from testifying at trial. The court rejected this sanction as too extreme and instead ordered the cost of the deposition to be shared equally by Plaintiff and Defendants. We do not believe that the court abused its discretion in awarding this sanction.

instructed to permit the complaint to be appropriately amended.

## VII.

Because HRS chapter 480 will be applied, we examine the court's findings regarding Wholesale Motors' alleged misrepresentations of the Corvette's list price and of the Pontiac's wholesale value.

### A.

■ As we have recounted, finding 12b stated, in part, that "Wholesale [Motors] made material misrepresentations ... [including] [t]hat the list price of the Corvette was $31,995.00 when in fact it was $25,500.00[.]"

In its cross-appeal, Wholesale Motors claims that this part of finding 12b is incorrect. We review findings to determine if they are clearly erroneous. *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996). A finding is clearly erroneous when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence to support the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation and internal quotation marks omitted).

Ford admitted he told Plaintiff the list price of the Corvette was "$31,995 plus fee." On the other hand, Plaintiff contends that the list price was actually $27,500, which is the figure designated as "price" on the Corvette's "vehicle stock card." There is only one price typewritten on the Corvette's stock card.[20]

Ken Stanford (Stanford), manager of Wholesale Motors, testified that Wholesale Motors routinely establishes list prices and that the vehicle stock cards indicate the list prices. Stanford confirmed that the list price for another car was $11,000, as indicated on its vehicle stock card. The $11,000 list price for the other car is noted in the same place on its vehicle stock card as the $27,500 price is noted on the Corvette's vehicle stock card.

However, Stanford denied that the list price of the Corvette was $27,500, testifying as follows:

Q. [Plaintiff's counsel]: Isn't it true that the list price [of the Corvette] was established at $27,500?

A. [Stanford]: No. It may have been when the car came in. I don't know what that exact figure is. But as the cost of the car changes, so does the retail price change.

Q. [Plaintiff's counsel]: Was there ever any change in the vehicle stock card on the transaction?

A. [Stanford]: No, *we don't change the retail price on the stock cards,* we just sell. It's up to the sales manager to price out the cars.

(Emphasis added.) This testimony appears to indicate that what is noted on the vehicle stock card is the "retail price" of a vehicle. Stanford did not explain whether the "retail price" is the same as the "list price" for a vehicle, and it does not appear that any explanation on this point was provided in the record. "List price" is generally defined as "[t]he published or advertised price of goods which may change after negotiation and be reduced by a discount or rebate for prompt payment or volume purchase." *Black's Law Dictionary* 932 (6th ed.1990).[21]

Upon reviewing the record, we conclude that the single price set forth on the Corvette's stock card, Stanford's testimony that the vehicle stock cards indicate list prices, and Stanford's affirmation that the list price on the other car was $11,000 as indicated on its stock card together provide substantial evidence to support the court's finding that Ford misrepresented the list price of the Corvette. On the evidence before it, the

---

20. There is a handwritten notation at the bottom of the Corvette's vehicle stock card reading "5%—1,125.00." There is no explanation of this notation. No other prices are written on the card.

21. List price is also defined as "the basic price of an item as published in a catalog, price list, or advertisement before any discounts are taken." *Merriam–Webster's Collegiate Dictionary* 680 (10th ed.1993).

court could have found that the "list price" and the "retail price" were the same price, and chosen to disbelieve that "it's up to the sales manager" to change the retail, or list, price.[22] Thus, we cannot conclude that that part of finding 12b concerning the misrepresentation of the Corvette's list price would be clearly erroneous.[23]

## · B.

■■ Wholesale Motors also disputes the finding that the Pontiac's wholesale value was $8875. This contention appears to be correct. The record reflects that no one testified to and no evidence was presented to support this figure. In response, Plaintiff simply states that the court "found that the actual wholesale Blue Book value was $8,875." (Footnote omitted). While true, we are unable to ascertain from the record how the court arrived at this figure.

Finding 12b declared, in part, that "Wholesale [Motors] made material misrepresentations with the intent to induce and deceive Plaintiff to enter into the sales/purchase transaction [including] [t]hat the wholesale value of the [Pontiac] was $6,500.00 [24] when in fact it was $8,875.00." Reviewing the record, we must conclude that this portion of finding 12b is clearly erroneous.

Therefore, that part of finding 12b concerning the Pontiac's wholesale value and any misrepresentation thereof must be vacated and remanded to the court for a new determination.

## VIII.

The other potential unfair or deceptive trade act discussed at great length by the parties involves Wholesale Motors' retention of the Pontiac. Given our remand to determine whether Plaintiff could recover under HRS § 480–13, we do not reach the parties' arguments concerning whether retention of the Pontiac was, as Wholesale Motors contends, justified under the terms of the Completion Agreement or, as Plaintiff contends, conversion and an unfair or deceptive trade act.

HRS § 480–12 (1993) provides that "[a]ny contract or agreement in violation of [HRS chapter 480] is void and is not enforceable at law or in equity." Finding 13, stating that "[b]oth Plaintiff and [Wholesale Motors] deceived each other into entering into the transaction[,]" is apparently based on the misrepresentations by both parties referred to in finding 12. If the court on remand again finds that Wholesale Motors misrepresented the wholesale value of the Pontiac, then finding 13 implies that the transaction, with the contracts signed by Plaintiff, was entered into based on these misrepresentations. If, additionally, the misrepresentation of the list price and/or the misrepresentation of the wholesale value constitute violations of HRS § 480–2, then HRS § 480–12 would render the Completion Agreement void.

Wholesale Motors justified its retention of the Pontiac on the Completion Agreement. Plaintiff, on the other hand, contends in part that the contracts "contemplated" the return of the Pontiac to him if the sale did not occur. Since the arguments concerning conversion rely largely on the contracts, which may be void depending on the court's action on remand, we do not reach these issues. We note that the court held, contrary to the motions court, that "it was proper for [Wholesale Motors] to retain the [Pontiac]." It must on remand reconcile this conflict. See *supra* note 11.

---

22. Wholesale Motors argues that even if it is true that Defendants misrepresented the list price to Plaintiff, "at worst, Defendants 'puffed' its list price ... by some twenty percent" and " 'puffing' is an everyday practice of car dealers throughout the State, and is an expected part of the negotiation process." Defendants produced no evidence at trial to support this contention. Thus, this argument is without merit.

23. The court apparently did err in stating that Wholesale Motors misrepresented the list price of the Corvette to be $25,500, since the vehicle stock card indicated a price of $27,500 and Plaintiff contends the list price was $27,500.

24. As noted previously, Ford testified he told Plaintiff that the Blue Book value of the Pontiac was $6000. However, finding 12b stated that Wholesale Motors misrepresented the wholesale value of the Pontiac to be $6500. The court apparently arrived at the $6500 figure from viewing the Completion Agreement, which listed that amount as the "actual cash value" of the Pontiac.

## IX.

As noted above, the court awarded Wholesale Motors $450 for the reasonable rental value of the Corvette and $750.68 for the cost of repairs to the Corvette. We address this award to guide the court on remand if it finds that Plaintiff should recover under HRS § 480–13.

### A.

■ While HRS § 480–13 does not specifically provide for a setoff in unfair and deceptive trade practice cases, under certain circumstances, we conclude that such a setoff is allowable. The supreme court has noted that in awarding damages under HRS § 480–13, the plaintiff should be placed in the position he or she would have held had he or she not been defrauded. *Leibert v. Finance Factors*, 71 Haw. 285, 788 P.2d 833, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1990). Correspondingly, while a plaintiff should be compensated for loss suffered, he or she should not be permitted to reap a benefit received from the defendant under the contract.

In *Majcher v. Laurel Motors*, 287 Ill. App.3d 719, 223 Ill.Dec. 683, 689, 680 N.E.2d 416, 422 (1997), the appellate court held that a plaintiff who sued under Illinois' Consumer Fraud and Deceptive Business Practices Act and rescinded the contract based on the defendant's deceptive practices should return "any consideration or property received" and "account for any benefits it received from the other party under the contract." While the Illinois court did not award a setoff to the defendant for mileage driven while the plaintiff had possession of the car because there was no evidence that the plaintiff in fact benefitted from having the car, the court approved the use of a setoff to "restor[e] ... the parties to their status before contracting." *Id.*

Similarly, a plaintiff cannot be unjustly enriched at a defendant's expense simply because the defendant is liable for unfair or deceptive trade practices. The Texas Supreme Court has upheld an award of reasonable rent to a builder from the consumer who lived in the unfinished house for ten months, which offset the award of damages to the consumer under Texas's Deceptive Trade Practices Act. *Smith v. Baldwin*, 611 S.W.2d 611, 617 (Tex.1980). The court affirmed the trial court's finding that to allow the consumer to live in the home for such a period without paying rent "would constitute unjust enrichment." *Id.*

■ In the instant case, Plaintiff does not dispute the reasonable rental value of the Corvette for the ten days he possessed it, nor does he dispute the cost of repairs for the damages he allegedly inflicted to the Corvette during that time. We believe the court correctly awarded damages to Wholesale Motors on these items. These damages do not constitute compensation to Wholesale Motors for "money expended in furtherance of deceptive trade practice violations." *State v. Western Capital Corp.*, 290 N.W.2d 467, 471 (S.D.1980) (affirming the denial of a setoff for expenses incurred by the defendant loan broker in obtaining financing for plaintiffs, when such financing arrangements were procured by deceptive trade practices and the alleged expenses were of a "doubtful" nature). Under such circumstances, we uphold the award to Wholesale Motors for the Corvette's rental value and repairs.

### B.

■ If the court on remand finds that Plaintiff should recover under HRS § 480–13, then damages sustained by Plaintiff may be trebled pursuant to HRS § 480–13(b)(1). We direct that any trebling of damages be calculated *before* the setoff award to Wholesale Motors is applied. *Contra Smith*, 611 S.W.2d at 617 (holding that "[a]llowable setoffs will necessarily reduce the actual damages and hence the sum subject to trebling"). Calculation of the trebling of damages in this way would comport with the purpose of the statute. "Treble damages are a form of deterrence and hence serve a purpose similar to punitive damages. A legislative purpose of HRS § 480–2 was the deterrence of fraudulent, unfair or deceptive business practices." *Han v. Yang*, 84 Hawai'i 162, 177, 931 P.2d 604, 619 (1997) (citations and internal quotation marks omitted). The legislature also intended to "marshall[ ] the assistance of the

general public in combatting the perpetration of unfair and deceptive acts in trade and commerce [by] allow[ing] members of the consuming public to act as 'private attorneys general' to enforce HRS §§ 480–2 through 480–13." *Cieri v. Leticia Query Realty,* 80 Hawai'i 54, 61–62, 905 P.2d 29, 36–37 (1995).

Accordingly, trebling damages *after* the setoff is applied would " 'make[ ][the] error of artificially trebling the defendant's counterclaim, and thereby emasculate[ ] both the deterrent effect and private enforcement incentives' " under HRS chapter 480. *Guerra v. Brumlow,* 630 S.W.2d 425, 433 n. 1 (Tex. Ct.App.1982) (quoting D. Bragg, P. Maxwell & J. Longley, *Texas Consumer Litigation* 73–4 (Supp.1981) (criticizing *Smith* )).

## X.

Because we remand the question of the Pontiac's wholesale value, we address the parties' arguments on this issue.

### A.

Plaintiff maintains that the motions court erred in refusing to accept Plaintiff's expert witness's appraisal as "the only competent evidence" of the Pontiac's value and, at trial, the court erred in failing to accept that appraisal.

■ We conclude the motions court was correct in setting aside its original partial summary judgment acceptance of the Ahina appraisal. The motions court originally found that there were "numerous questions of material fact regarding the transaction." On Defendants' motion to reconsider, the motions court returned to this position. Because the value of the Pontiac was a proper subject of expert opinion, the motions court did not abuse its discretion in finding that issue should be tried.

We also disagree that the court erred in rejecting Ahina's wholesale valuation of the Pontiac to be $10,960 and the retail value to be $14,918.72. Plaintiff argues that Ahina's appraisal was "uncontroverted," but in fact the Ahina appraisal was controverted because other credible evidence as to the Pontiac's value was received at trial.

### B.

Wholesale Motors has argued in its cross-appeal that (1) Ahina should have been disqualified as an expert witness and (2) Mark Allison (Allison), Defendants' proffered expert witness, should have been allowed to testify.

### 1.

■ In our view, the court did not err in qualifying Ahina as an expert witness. The decision to qualify a witness as an expert witness is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *See State v. Rodrigues,* 67 Haw. 70, 73–74, 679 P.2d 615, 618, *cert. denied,* 469 U.S. 1078, 105 S.Ct. 580, 83 L.Ed.2d 691 (1984).

■ Hawai'i Rules of Evidence (HRE) Rule 702 provides that a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]" Ahina described his twelve years of experience in buying, selling, and appraising cars at length during direct examination and voir dire. The court determined that Ahina was qualified as an expert in appraising vehicles, and based on Ahina's testimony, its decision was not an abuse of discretion.

■ Wholesale Motors' other attacks on Ahina's qualifications are similarly without merit. Wholesale Motors contends that Ahina was not sufficiently knowledgeable about the particular model he appraised. However, "once the basic requisite qualifications are established, the extent of the expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony." *Larsen v. State Savings & Loan Assn.,* 64 Haw. 302, 304, 640 P.2d 286, 288 (1982) (citations omitted). Wholesale Motors argues that Ahina's appraisal was "merely a mechanical transcription of the Blue Book guideline values, copied without adjustments" but this contention is false, as Ahina explained his adjustments at trial. Finally, Wholesale Motors maintains that Ahina "did not even inspect the vehicle" yet does not provide any record cite to support this asser-

tion, which is contradicted by Ahina's own testimony.

### 2.

Plaintiff had originally retained Allison in 1992 to appraise the Pontiac. Allison sent a letter to Plaintiff's attorney, dated May 10, 1992, which set forth Allison's appraisal of the Pontiac's wholesale and retail values. Plaintiff did not call Allison as a witness at trial.

Defendants first notified Plaintiff of their intention to call Allison as an expert witness in their First Amended Responsive Pre-trial Statement, filed January 5, 1994. They stated that Allison "will testify about the value of the [Pontiac] trade-in." Defendants' Final Naming of Witnesses, filed January 20, 1994, also listed Allison as an expert witness. Defendants did not supplement their responses to interrogatories to indicate Allison would be called. Although Plaintiff must have become aware on January 5, 1994 of Defendants' intention to call Allison and trial was scheduled for March 21, 1994, Plaintiff did not move to strike Allison as a witness or depose him during this time period.

When Defendants called Allison to testify, Plaintiff objected, urging that Allison should not be allowed to testify because (1) Defendants had not properly supplemented their interrogatory responses and (2) Plaintiff had originally retained Allison and had not released him.

### a.

■ The court ruled that Plaintiff had sufficient notice of Defendants' intention to call Allison as an expert witness through Defendants' Amended Responsive Pre-trial Statement. However, the court precluded Allison from testifying, explaining that if Defendants had indicated Allison would testify about the May 20, 1992 letter, then there would have been "adequate notice to [Plain-tiff] that [P]laintiff had better either move to strike or move to depose."

We conclude that the court erred in ruling that Plaintiff did not have adequate notice. In their January 5, 1994 pre-trial statement, Defendants disclosed that Allison "w[ould] testify about the value of the [Pontiac] trade-in." Hence, Plaintiff should have reasonably anticipated that Allison's testimony would cover Allison's prior (and only) appraisal, set forth in the May 20, 1994 letter.

■ Plaintiff, therefore, had ample time to move to strike Allison as a witness before trial or depose him about the basis of his appraisal. A party who could learn of the basis of an expert's opinion before trial but neglects to do so cannot complain of prejudice if the expert's opinion is admitted. *See Lai v. St. Peter,* 10 Haw.App. 298, 317–18, 869 P.2d 1352, 1362 (1994). Thus, we hold that the court erred in refusing to permit Allison to testify on that basis.

### b.

■ Nevertheless, the court is required to address Plaintiff's objection concerning Plaintiff's original retention of Allison, because Allison's testimony may properly be disallowed on this ground. *City & County of Honolulu v. Bonded Inv. Co.,* 54 Haw. 385, 391, 507 P.2d 1084, 1089 (1973), provides the standards for determining when one party may call experts retained but not used at trial by another party.[25] In *Bonded Investment,* the trial court did not permit condemnees to call as witnesses expert appraisers used by the City in preparing its case but not called to testify by the City. The supreme court upheld the trial court's decision, noting that (1) the appraisers "possessed no unique knowledge with regard to the instant case as would an eyewitness of an automobile accident[;]" (2) the condemnees could have hired their own expert appraisers; (3) the condemnees did not show good cause as to why the City's experts should have been called;

---

**25.** Wholesale Motors relies on *Wakabayashi v. Hertz,* 66 Haw. 265, 660 P.2d 1309 (1983) for its contention that it was reversible error for the court to disallow Mark Allison (Allison) from testifying. *Wakabayashi* concerns Hawai'i Rules of Civil Procedure (HRCP) Rule 26(b)(4)(B) standards on when discovery is permitted of facts known or opinions held by an expert who has been retained by another party and is not expected to testify at trial. In this case, Wholesale Motors did not seek discovery of Allison's opinions; Wholesale Motors knew what Allison's appraisal was and sought to use Allison at trial. Thus, *Wakabayashi* is not applicable to this case.

and (4) the condemnees did not show the "unavailability of other competent expert appraisers[.]" *Id.*

Wholesale Motors makes several claims as to why Allison should have been permitted to testify. According to Wholesale Motors, "Allison runs Hawaii Auto Auction, the only auto auction in the State, and is perhaps the most qualified expert in the State as to the wholesale value of automobiles." Other than its bare assertions, Wholesale Motors provides no support for this claim.

Next, Wholesale Motors contends that because Allison inspected the Pontiac prior to June 1992 and the Pontiac had not been in its possession since then, Allison should have been allowed to testify. Wholesale Motors does not indicate why the Pontiac was not in its possession after June 1992, although in his Opening Brief, Plaintiff claims that the Pontiac was forfeited to the Internal Revenue Service (IRS). At trial, Plaintiff's attorney represented that he spoke with the "IRS agent in charge[,]" who told him that the Pontiac was "easily and readily available and in Honolulu for any expert to inspect it." Again, other than the assertion of Plaintiff's attorney, there is no support in the record for this claim either.

If Wholesale Motors truly could not inspect the Pontiac after June 1992 (two months after Plaintiff filed his complaint), then Allison may have possessed "unique knowledge" about the Pontiac that would enable him to testify under the standards of *Bonded Investment.* In addition, such circumstances could amount to "good cause" for allowing Allison to testify and to show why Wholesale Motors could not practically employ its other experts. However, during the arguments over Plaintiff's objection, the facts concerning Wholesale Motors' ability (or inability) to obtain another expert were not fully discussed, perhaps because the court sustained Plaintiff's objection for other reasons.

Thus, on remand it must be determined whether Allison should be allowed to testify under the standards established in *Bonded Investment.*

## XI.

Wholesale Motors filed a cross-appeal contingent upon the reversal or modification of the court's decision. Because we vacate in part, we consider the following arguments in its cross-appeal which have not already been discussed above: (1) Plaintiff's attorney should have been disqualified; (2) the adjudication in favor of the individual defendants Ford and Miranda should extinguish Wholesale Motors' liability; and (3) Defendants' motion for costs under HRCP Rule 68 should have been granted.

### A.

#### 1.

On June 1, 1992, Wholesale Motors filed a motion to disqualify Charles S. Lotsof (Lotsof) from representing Plaintiff, based on Canon 4 of the Code of Professional Responsibility (CPR),[26] and the related Ethical Consideration 4–6 and Disciplinary Rule 4–101.[27] Wholesale Motors alleged that Lotsof previously was an associate with the law firm of

---

**26.** The Code of Professional Responsibility (CPR) was in effect at the time of Wholesale Motors' motion to disqualify Charles S. Lotsof (Lotsof). CPR Canon 4 stated: "A lawyer should preserve the confidences and secrets of a client."

On December 6, 1993, the Hawai'i Supreme Court adopted the Hawai'i Rules of Professional Conduct (RPC), which replaced the CPR. The RPC were effective January 1, 1994, after the date of Wholesale Motors' disqualification motion.

**27.** The canons of the CPR were "statements of axiomatic norms" which "embod[ied] the general concepts from which the Ethical Consider-

ations and the Disciplinary Rules [we]re derived." CPR, Preliminary Statement.

CPR Ethical Consideration 4–6 provided that "[t]he obligation of a lawyer to preserve the confidences and secrets of his [or her] client continues after the termination of [the lawyer's] employment." CPR Disciplinary Rule 4–101(B) provided that:

[A] lawyer shall not knowingly:

(1) Reveal a confidence or secret of his [or her] client.

(2) Use a confidence or secret of his [or her] client to the disadvantage of the client.

(3) Use a confidence or secret of his [or her] client for the advantage of himself [or herself] or of a third person, unless the client consents after full disclosure.

Hyman Greenstein (Greenstein) during which time Lotsof and other members of Greenstein's firm represented Wholesale Motors, that the subject matter of the ·prior representation was "substantially related" to the instant action,[28] and that Lotsof thus violated Canon 4 by representing Plaintiff adversely to Wholesale Motors.

At the end of the June 24, 1992 hearing on the disqualification motion, the motions court stated that Plaintiff's choice of counsel on one hand and protecting confidences divulged in former representation on the other were the competing policies at stake. On November 12, 1992, the motions court entered a written order denying the motion.

■ We review the order denying Wholesale Motors' motion to disqualify Plaintiff's attorney under the abuse of discretion standard. *Lussier v. Mau–Van Dev., Inc.,* 4 Haw.App. 359, 397, 667 P.2d 804, 828 (1983). We do not believe that the motions court abused its discretion.

### 2.

■ The standards for attorney disqualification motions premised on Canon 4 of the CPR were set forth in *Otaka, Inc. v. Klein,* 71 Haw. 376, 378, 791 P.2d 713, 715, *reconsideration denied,* 71 Haw. 665, 833 P.2d 899 (1990). There must be a former attorney-client or fiduciary relationship in order for Canon 4 of the CPR to apply. *Id.* at 382, 791 P.2d at 717. The key to determining whether such a relationship existed is " 'what the prospective client thought when he [or she] made the disclosure, not what the lawyer thought.' " *Id.* at 383, 791 P.2d at 717 (quoting "Developments in the Law—Conflicts of Interest in the Legal Profession," 94 Harv. L.Rev. 1244, 1322 (1981) (citations and footnotes omitted)).

Joseph P. Nicolai (Nicolai), Wholesale Motors' president, and Lotsof disputed whether

there was any disclosure to Lotsof at all. Nicolai represented in an affidavit that Lotsof met once with him to review approximately five to ten Wholesale Motors documents, including the Completion Agreement. Nicolai also averred that an attorney-client relationship existed between Wholesale Motors and the Greenstein attorneys.

Countering this, Lotsof claimed in his affidavit that he had "absolutely no recollection of ever having met" Nicolai before he took Nicolai's deposition for the disqualification motion and that he had "no recollection of ever having anything to do" with Wholesale Motors. Lotsof also submitted portions of Nicolai's deposition, in which Nicolai admitted that Lotsof's name did not appear in Wholesale Motors' corporate records and, furthermore, that Nicolai could not remember what Lotsof did with the documents during the meeting, how long the meeting lasted, or approximately when during the 1970s the meeting occurred.

When there is "any conflict in the evidence, the weight and credibility of testimony is for the trial court to determine." *MPM Hawaiian, Inc. v. Amigos, Inc.,* 63 Haw. 485, 487, 630 P.2d 1075, 1077 (1981). We cannot conclude that the motions court abused its discretion in apparently making such a determination here in favor of Plaintiff by denying Wholesale Motors' disqualification motion.

### 3.

We recognize that even if Lotsof himself did not perform legal services which would require his disqualification, CPR Ethical Consideration 4–6 and CPR Disciplinary Rule 4–101(B)[29] could serve to disqualify him, if he gained knowledge of any confidences and secrets of Wholesale Motors while working for Greenstein's firm.

However, there was also a dispute as to whether Greenstein's firm performed legal

28. In particular, Joseph P. Nicolai (Nicolai), Wholesale Motors' president, represented in an affidavit that while working for Hyman Greenstein's firm, Lotsof met once with Nicolai and "performed professional legal services ... including review and revision of the 'Completion Agreement.' "

29. The CPR did not contain a specific provision concerning a lawyer's duties to clients of the lawyer's former firm. RPC Rule 1.9 contains two provisions addressing this issue, subsections (b) and (c). The application of both provisions requires the lawyer to have actual knowledge of confidential information about the client represented by the lawyer's former firm.

services for Wholesale Motors during the time Lotsof was employed with Greenstein's firm, and if so, whether Lotsof acquired confidential information about Wholesale Motors during that time. Plaintiff and Wholesale Motors submitted various affidavits and documents to support their positions on this point. Again, given this conflicting evidence, we do not believe the motions court abused its discretion by denying Wholesale Motors' motion for disqualification.

### B.

 We do not concur with Wholesale Motors' argument that the adjudication in favor of the individual defendants, Ford and Miranda, should extinguish the liability of their employer, Wholesale Motors.

Finding 5 stated that "Ford and Miranda were at all times relevant hereto employees of [Wholesale Motors], acting within the scope of their said employment with respect to every act and omission attributed to them below." In conclusion 5, the court then held that Ford and Miranda were not liable to Plaintiff because Wholesale Motors "authorized, ratified, and approved of the conduct and representations of its employees, agents, and representatives, inclusive of . . . Ford and Miranda." A verdict against the principal alone, and not against his agents, is proper when the agents acted at the direction of the principal and the principal ratified their wrongful conduct. *Mims v. Bennett,* 160 S.C. 39, 158 S.E. 124, 125–26 (1931).

Wholesale Motors relies on *Saranillio v. Silva,* 78 Hawai'i 1, 15, 889 P.2d 685, 699, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995) for the proposition that "an adjudication acquitting an employee of liability should extinguish the liability of the employer," but this principle is inapplicable here. An adjudication acquitting an employee of liability bars a finding of liability on the part of the employer "when the employer's liability rests *solely* on respondeat superior." *Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805, 807 n. 2 (Tex.1980) (emphasis added). Wholesale Motors' liability did not rest solely on a respondeat superior theory. Plaintiff

brought an action against Ford and Miranda for their actions and misrepresentations and against Wholesale Motors for ratifying and condoning these actions and misrepresentations. Thus, a finding against Wholesale Motors would be proper even if the court did not hold Ford and Miranda liable to Plaintiff.

### C.

On remand the damages awarded to Plaintiff may be amended. Thus, we do not reach Wholesale Motors' contention that because its offer of judgment exceeded the court's award of damages to Plaintiff, it was entitled to costs under HRCP Rule 68.

### XII.

For the foregoing reasons, with respect to the amended judgment of December 8, 1994, we affirm in part, vacate in part and remand in part for disposition on the grounds stated herein.